UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BABYAGE.COM, INC., | : | |
| Plaintiff-Counterclaim Defendant | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:07-cv-01600-ARC |
| LEACHCO, INC., | : | |
| Defendant-Counterclaim Plaintiff/ | : | |
| Third Party Plaintiff | : | Judge A. Richard Caputo |
| | : | |
| and | : | |
| | : | Filed Electronically |
| JAMIE S. LEACH, | : | |
| Counterclaim Plaintiff/ | : | |
| Third Party Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN M. KIEFER, JR., | : | |
| Third Party Defendant/ | : | |
| Counterclaim Plaintiff | : | |

## ANSWER, DEFENSES, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF THIRD PARTY DEFENDANT/COUNTERCLAIM PLAINTIFF, JOHN M. KIEFER, JR.

Third Party Defendant/Counterclaim Plaintiff, John M. Kiefer, Jr. ("Kiefer"), by and through his counsel, answers the Third Party Complaint of Leachco, Inc. ("Leachco"), and Jamie S. Leach ("Leach"), as follows:

1.  Kiefer is without knowledge or information sufficient to form a belief as to the truth of the averment.

2.  Kiefer is without knowledge or information sufficient to form a belief as to the truth of the averment.

3.    Kiefer, in his capacity as a corporate officer of Plaintiff-Counterclaim Defendant, BabyAge.com, Inc. ("BabyAge"), admits as to BabyAge's residence and established place of business; denied as to the remainder.

4.    Kiefer, in his capacity as a BabyAge corporate officer works within this District; denied as to the remainder.

5.    Kiefer admits that this action purports to be an action for patent infringement, but denies that Third Party Plaintiff is entitled to any recovery. While Kiefer does not contest subject matter jurisdiction, the allegations of this paragraph are legal conclusions for which no answer is required or given.

6.    Kiefer admits the face of the patent bears an issue date of July 13, 2004, but denies its validity.

7.    Kiefer is without knowledge or information sufficient to form a belief as to the truth of the averment.

8.    Kiefer is without knowledge or information sufficient to form a belief as to the truth of the averment.

9.    Kiefer, in his capacity as a BabyAge corporate officer denies the averment.

10.    Kiefer, in his capacity as a BabyAge corporate officer denies the averment.

11.    Kiefer, in his capacity as a BabyAge corporate officer denies the averment.

12.    Denied.

13.    Kiefer is without knowledge or information sufficient to form a belief as to the truth of the averment.

14.    Denied.

15. Denied.

## DEFENSES

16. Upon information and belief, and as will likely by supported by evidence after a reasonable opportunity for further investigation and discovery, U.S. Patent No. 6,760,934 is invalid for failure to comply with the conditions and requirements for patentability specified in Title 35 U.S.C., including, but not limited to 35 U.S. C. §§ 101, 102, 103, and/or 112.

17. Proprietary Cozy Comfort pillow products manufactured, used, and offered for sale by BabyAge do not infringe U.S. Patent No. 6,760,934.

18. Kiefer, in his capacity as a BabyAge corporate officer, sought legal counsel prior to BabyAge selling its Cozy Comfort pillow and did not willfully infringe.

19. Upon information and belief, Leachco and Leach knew or should have known that the design and use of BabyAge's Cozy Comfort pillow does not infringe any of the claims of U.S. Patent No. 6,760,934, and nevertheless brought the Third Party Complaint against Kiefer for the purpose of wrongfully intimidating and excluding BabyAge from the market for pillows; by initiating and maintaining the complaint, Leachco and Leach have engaged in patent misuse and vexatious litigation barring Leachco and Leach from any relief herein.

## AFFIRMATIVE DEFENSES

20. Upon information and belief, at the behest of and in conspiracy with Babies R Us, its largest customer, Leachco placed anticompetitive price controls on BabyAge as to BabyAge's pricing of Leachco's pillows covered by U.S. Patent No. 6,760,934, and is now refusing without cause to sell pillows covered by U.S. Patent No. 6,760,934 to BabyAge, thereby wrongfully prohibiting competition in the marketplace.

21.    Upon information and belief, and as will likely by supported by evidence after a reasonable opportunity for further investigation and discovery, U.S. Patent No. 6,760,934 is unenforceable because Leachco and Leach failed to disclose all non-cumulative, material prior art of which they were aware to the Patent Office during prosecution of the patent.

22.    Kiefer reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent and Trademark Laws of the United States and any other defenses, at law or in equity, that may now exist or in the future be available based on discovery and further factual investigation in this case.

**WHEREFORE, Kiefer respectfully seeks judgment against Leachco and Leach and asks the Court to:**

(A)    Declare that Kiefer has at all times acted solely in his capacity as a corporate officer carrying out his corporate responsibilities and not in his individual capacity;

(B)    Declare that Kiefer has not engaged in patent infringement;

(C)    Find U.S. Patent No. 6,760,934 invalid;

(D)    Declare that Kiefer has the right to sell the BabyAge Cozy Comfort pillow free from interference by Leach and Leachco, its officers, agents, servants, employees, attorneys, privies, representatives, successors, and assigns, and any and all persons acting by, through, or under authority from Leachco, either separately or jointly;

(E)    Permanently enjoin Leach and Leachco, its officers, agents, servants, employees, attorneys, privies, representatives, successors, and assigns, and any and all persons in active concert or participation with or under authority from Leachco, either separately or jointly, from:

1) Interfering with, or threatening to interfere with the sale of the Cozy Comfort pillow by Kiefer;

2) Instituting or prosecuting any suit or other proceeding placing in issue the right of Kiefer to sell the Cozy Comfort pillow;

(F)     Order Leach and Leachco to pay Kiefer's costs, including reasonable attorney's fees; and

(G)     Grant such other relief as the Court deems appropriate under all the circumstances.

## COUNTERCLAIM

Kiefer alleges as follows based upon personal knowledge, the investigation of his counsel, information and belief, and publicly-available information:

## INTRODUCTION

1.     BabyAge is a highly-efficient internet-based baby and juvenile product retailer. As a corporate officer of BabyAge, Kiefer files this counterclaim against Leachco.  Kiefer seeks to obtain damages and equitable relief from Leachco under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  As detailed below, Kiefer alleges that Babies 'R' Us ("BRU"), a dominant, multibrand retailer, coerced and induced Leachco to agree to enter into, maintain, and enforce minimum resale price maintenance agreements with retailers of such products, including BabyAge and others (the "Retailers").  The Leachco-Retailer Agreements prevented the Retailers, on penalty of termination (*i.e.*, being refused supply), from charging prices that were lower than the agreed minimum prices.

2.     Leachco is a manufacturer of high-end pregnancy pillows, nursing pillows, baby

carriers, and restraints.  The relevant high-end products manufactured by Leachco are carried by specialty baby retailers such as BabyAge and BRU.  Leachco is a dominant manufacturer of high-end pregnancy pillows.  Leachco also manufacturers nursing pillows, bedding, baby carriers, and restraints.

3.     Both the BRU-Leachco Agreements and the resulting Leachco-Retailer Agreements are comprised of contracts, combinations and/or conspiracies, whether oral or written, express or tacit.

4.     The Agreements, and each of them, unreasonably restrain trade in the relevant market(s) (defined below), causing substantial anticompetitive effects and net losses in consumer welfare, in violation of § 1 of the Sherman Act.

5.     Moreover, the Agreements were part and parcel of an anticompetitive scheme under which BRU leveraged its substantial market power and dominance to induce Leachco into agreeing to (a) impose and/or amend minimum resale price maintenance agreements on the Retailers, including on internet discounters like BabyAge, (b) enforce and/or heighten enforcement of those agreements against BabyAge and other Retailers, but not against BRU, (c) otherwise prevent Retailers from discounting the relevant products and/or protect BRU from having to suffer the profit-lowering effects of retail price competition, and (d) cut off supply to price-cutting retailers like BabyAge.  Through this scheme, BRU agreed and conspired with Leachco to fix prices at artificially high levels, unreasonably restrain trade, and to illegally maintain and enhance BRU's monopoly power.

6.     The Agreements, and the scheme in restraint of trade of BRU and Leachco, have harmed competition, including interbrand competition, in the relevant market(s) and caused

prices to be higher in the relevant market(s) than they otherwise would have been. The Agreements were specifically intended to protect BRU from price competition from highly efficient retailers like BabyAge by either mandating higher price levels, and thereby neutering the competition, or by eliminating the price-cutting competition entirely. The Agreements were also part of BRU's monopolistic scheme, which was designed to preserve and enhance BRU's market dominance and monopoly power. This scheme achieved its goals, and thereby excluded and frustrated competitors, such as BabyAge, substantially inflated prices to consumers, and reduced consumer welfare.

7.　　Because BabyAge is a highly efficient internet retailer, BabyAge wins sales and grows its businesses by dropping its prices lower than those of competitors (such as BRU). Conversely, BabyAge loses sales if it is prevented from dropping its prices lower than competitors such as BRU, or if it is cut off from supply entirely. Thus, the Agreements and Leachco's scheme has injured BabyAge by (a) depriving BabyAge of sales and profits that BabyAge would otherwise have garnered, and (b) diminishing of the capital value of BabyAge's business. The Agreements and Leachco's conduct impairs BabyAge's ability to compete with BRU and to take sales from BRU by preventing BabyAge from exploiting its highly efficient business model and/or by cutting it off entirely for the offense of cutting prices below agreed levels. In fact, prior to the imposition of the Agreements, BabyAge was rapidly growing its sales of the relevant products through, among other things, aggressive price competition. However, the Agreements and other alleged conduct of Leachco was intended to, and did, reverse those trends, and substantially harmed BabyAge thereby.

## JURISDICTION AND VENUE

8.      Original jurisdiction over Kiefer's claims vests in this Court under 28 U.S.C. §
1331, inasmuch as this action arises under the laws of the United States.

9.      Venue is proper in this federal judicial district under 15 U.S.C. § 15(a) because
Leachco resides, or is found, or has an agent here.  Alternatively, venue is proper in this judicial
district under 15 U.S.C. § 22 because Leachco is found or transacts business here.  Alternatively,
venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Leachco resides in
this judicial district within the meaning of 28 U.S.C. § 1391(c).  Alternatively, venue is proper in
this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving
rise to this lawsuit occurred here.

## PARTIES

10.     Kiefer is a corporate officer of BabyAge, a corporation duly organized and
existing under the laws of the State of Delaware, with a principal place of business located at 360
Stewart Road, Wilkes-Barre, PA 18706.  BabyAge operates an internet site at
www.babyage.com.

11.     Leachco is a corporation duly organized and existing under the laws of the state of
Oklahoma, with a principal place of business at 130 East 10th St., Ada, Oklahoma 74821.

## FACTS

12.     BRU is a dominant, multibrand retailer of baby and juvenile products, which
opened its first stores in 1996.  As of January of 2005, BRU operated over 200 Babies "R" Us
stores throughout the United States.  In a recent form 10-Q filing with the United States
Securities and Exchange Commission, BRU stated that it considers itself the "largest specialty

retailer of baby-juvenile products in the United States" and the "only specialty retailer in its category that operates on a national U.S. scale."

13.    BRU sells juvenile furniture, such as cribs, dressers, changing tables; bedding and related accessories; baby gear, such as play yards, booster seats, high chairs, strollers, and car seats; baby carriers and restraints, toddler and infant plush toys; gifts; clothing; infant feeding supplies; health and beauty aids; pregnancy and nursing pillows, and infant care products. In addition to its stores, BRU retails over the internet at www.babiesrus.com, a site administered by and with Amazon.com.

14.    Relative to BRU, BabyAge is a small company that competes in the relatively new, innovative trade channel known variously as "electronic commerce," "e-commerce," "e-tailing," "internet retail," *etc*. Specifically, BabyAge is an internet retailer of high-end baby and juvenile products. BabyAge is a highly efficient competitor because, among other reasons, its operating expenses are low. This allows BabyAge to compete vigorously on price, both with other internet retailers and with retailers in other trade channels, such as BRU (which operates through "brick and mortar" stores as well as on the internet). Like many other efficient internet retailers, BabyAge wins sales by dropping its prices lower than those of competitors such as BRU; conversely, BabyAge loses sales if BabyAge is prevented from dropping its prices lower than those of competitors (or if it is prevented from getting supply of key products like those sold by the Leachco).

15.    When allowed to compete freely, the price competition in which BabyAge and other internet retailers engage enhances consumer welfare by bringing down prices. For instance, if BabyAge's competitors, such as BRU, did not lower its prices to match or beat BabyAge's

prices, those competitors would lose sales to BabyAge. This is a classic example of the pro-competitive benefits of price competition.

16.    BRU has known, since the late 1990s, that the increasing popularity of "e-commerce," with its associated increase in price competition, would pose a substantial threat to BRU's sales and profits. For example, recently BRU has made public statements admitting its fear of price competition from efficient competitors like BabyAge. In January of 2005, BRU wrote in a form 10-K filing that "[s]ome of our competitors may have greater financial resources, lower merchandise acquisition costs, and lower operating expenses than our Company. If we fail to compete successfully, we could face lower net sales and may decide to offer *greater discounts to our guests*, which could result in *decreased profitability*" (emphasis added).

17.    BRU thus stated its fears that competitors like BabyAge would force it to give greater discounts to its customers and thereby lower BRU's profits. BRU reacted aggressively to this important threat to its pricing freedom and profitability. BRU sought to avoid such competitive constraints on its ability to garner increased sales volume and inflated prices.

18.    The tremendous pressure upon a dominant retailer (like BRU) in a traditional trade channel (like the "brick and mortar" trade channel) to react anticompetitively to threats to its pricing freedom, such as those posed by retailers in a new and efficient trade channel (like BabyAge), have been the subject of study by, and recent testimony before, the Federal Trade Commission ("FTC"). As one participant in the FTC's 2002 public workshop, entitled "Possible Anticompetitive Efforts to Restrict Competition on the Internet," stated:

> The promise of the world of electronic commerce is to create an environment where consumers can freely shop between various competitive alternatives. By reducing transaction costs and improving transparency, the Internet offers the potential of

dramatically improving competition in various retail markets.

> \* \* \* [But] *as new market forces arise, . . . "traditional"*
> *competitors often respond to the threat by trying to create*
> *barriers to thwart those new entrants*.

*See* David A. Balto, Testimony Before the FTC, Office of Policy Planning, Public Workshop on

E-Commerce, at 1-2 (October 10, 2002) (emphasis added).

19.     Leachco sells substantial shares, respectively, of its total volume of the products at

issue through BRU, and thus has become increasingly dependent upon BRU for its businesses.

20.     Because suppliers of products (like Leachco) depends on retailers (like BRU) to

sell its products, it is not surprising that a dominant retailer like BRU would use that dominance

to protect against price competition by coercing suppliers like Leachco into disadvantaging

retailers (like BabyAge) in the new, efficient trade channel.

21.     For instance, speaking at that same FTC public workshop, FTC Commissioner

Sheila Anthony underscored the potential threat to competition posed by a dominant retailer (like

BRU), whom suppliers (like Leachco) cannot do without.  The concern is that a dominant retailer

like BRU could use its market power to coerce key suppliers into disadvantaging competing

retailers (like BabyAge), and thereby protect and preserve its market dominance:

> Competition among distributors for a given manufacturer's favor is
> almost certainly healthy.    But problems may arise where
> distributors in one channel exercise its market power to
> disadvantage distributors in another channel. \* \* \* [C]an Internet
> distribution ever gain a strong foothold in some product areas
> where the entrenched distribution channel, members who
> manufacturers cannot do without, at least until e-commerce
> matures, use hardball tactics to make sure that the transition period
> never begins?

*See* FTC, Public Workshop:   Possible Anticompetitive Effects to Restrict Competition on the

Internet, transcript of proceedings, at 797:12-16, 799:7-12 (October 10, 2002) (remarks of Commissioner Shiela F. Anthony).

22. Indeed, because of BRU's position as a dominant multibrand retailer in the relevant market(s), BRU was able to, and did, induce and require the creation of the BRU-Leachco Agreements. Among the relevant provisions of the BRU-Leachco Agreements was that, in consideration of BRU's starting (or continuing) to stock and sell the products manufactured by Leachco, Leachco had to ensure that Retailers, such as BabyAge and others, would, on penalty of termination, charge a minimum resale price for the products supplied to them by Leachco.

23. Upon information and belief, BRU sold about $4.5 million worth of Leachco product in 2005, and made up about 30% of Leachco's business.

24. Sometime around May, 2006, in a meeting and in a letter, Marsha Costello of BRU told Clyde Leach that a condition of BRU's buying Leachco products for resale through BRU was Leachco's ensuring that all of Leachco's other Retailer customers refrained from discounting Leachco's products.

25. Leachco agreed with BRU that it would ensure that all other Retailer customers of Leachco, and especially internet retailers such as BabyAge, would not discount Leachco products. In return, BRU agreed to pay Leachco's increased wholesale prices.

26. Prior to July 2006, Leachco never set minimum resale prices, or had an internet pricing policy, or any other type of pricing policy.

27. On or about July 7, 2006, as a result of its agreement with BRU, Leachco presented BabyAge with its new internet pricing policy, which it said BabyAge would have to sign if it wanted to receive any more product from Leachco.

28. Prior to BabyAge signing any agreement with Leachco, Leachco told BabyAge that other Retailers, including Baby Universe, had signed agreements not to discount Leachco products.

29. Leachco withheld product from BabyAge until BabyAge returned a signed internet pricing policy to Leachco.

30. On or about July 7, 2006, BabyAge signed the Leachco internet policy and sent it to Leachco, along with a cover letter which objected to the minimum pricing policy.

31. From July 2006 to August 2007, Leachco attempted to prohibit BabyAge from discounting Leachco product by, *inter alia*, threatening to withhold product from BabyAge, pursuant to Leachco's agreement with BRU

32. Around August 2007, Leachco stopped providing any product to BabyAge, pursuant to Leachco's agreement with BRU.

33. BRU required Leachco to impose minimum resale pricing with respect to Leachco's other Retailers (i.e. BRU's retailer competitors), in a form that met with BRU's prior approval, and Leachco acquiesced to such demands.

34. BRU was not similarly required to comply with minimum resale pricing but instead charged retail prices that were effectively just slightly lower than the prices at which BRU required Leacho to ensure the other Retailers were selling (but which were far higher than the retail prices at which BRU could profitably sell but for the conduct challenged in this lawsuit).

35. BRU dictated terms and conditions under which Leachco had to do business with its other Retailers (i.e., BRU's retailer competitors), and Leachco agreed to same, including

dictating the resale prices such other Retailer customers of Leachco had to charge for Leachco products, and dictating who the Retailer customers of Leachco would, and would not, be.

36.     BRU engaged in extensive retail price surveillance to ensure that Leachco was not in breach of the BRU-Leachco Agreement, and Leachco, fearful of being found in breach, did so as well.

37.     BRU and Leachco together co-developed strategies to insulate BRU from having to engage in profit-lowering retail price competition.

38.     Leachco then, pursuant to its agreement with BRU, entered into the Leachco-Retailer Agreement, including the agreement with BabyAge.  Among the relevant provisions of the Leachco-Retailer Agreements was that, in consideration of Leachco continuing to supply the Retailers with product, the Retailers were prohibited, on penalty of termination, from lowering, past a certain price floor, the prices at which they sold Leachco's goods to consumers.

39.     The Leachco-Retailer Agreements came about not through the independent conduct of Leachco, but instead at BRU's request and demand, and as a result of the BRU-Leachco Agreement.

40.     As to the provisions of the Leachco-Retailer Agreement, BRU was the undisclosed principal of Leachco.

41.     BRU caused the Leachco-Retailer Agreements to be created, maintained, and enforced to further its dominance in the relevant market(s), and for the clearly anticompetitive purposes of earning excess profits and eliminating and/or insulating itself from price competition from other Retailers, such as BabyAge herein.

42.     The Leachco-Retailer Agreement directly benefited BRU.

43.     At the behest of BRU, which threatened Leachco with termination (*i.e.*, being deprived of the ability to continue (or start) to retail the relevant products through BRU) if it did not enter into the Agreement, Leachco maintained and enforced the Leachco-Retailer Agreements, and did so in a complex manner, often utilizing intermediaries.

44.     Specifically, Leachco, by and through its various representatives, and specifically pursuant to the BRU-Leachco Agreements, (a) met with, exhorted, threatened, warned, cajoled, and/or negotiated with Retailers, including BabyAge herein, on an individualized basis, concerning the prices at which the Retailers sold its products, (b) sought the Retailers' acquiescence to, and assurances of, compliance with the terms of the Leachco-Retailer Agreements, (c) threatened the Retailers with termination of product supply for noncompliance, and (d) on certain occasions did in fact terminate Retailers.

45.     The acquiescence and compliance by Retailers (like BabyAge) in minimum pricing, was, to Leachco, preferable to termination or non-supply of noncompliant Retailers, because Leachco wanted, and profited from, sales to the Retailers.

46.     The creation and enforcement of the Leachco-Retailer Agreements was orchestrated by BRU. Thus, Leachco did *not* simply or unilaterally:

        (a)     refrain from selling to uncongenial Retailers;

        (b)     suggest resale prices that were widely followed;

        (c)     sanction and/or terminate Retailers who failed to maintain a minimum resale price;

        (d)     announce and enforce policies of sanctioning and/or terminating Retailers who failed to maintain a minimum resale price; or

(e)     sanction and/or terminate other Retailers following, or in response to, complaints by Retailers such as BRU.

47.     The Agreements represent a conscious commitment to a common scheme, designed to achieve an unlawful objective, between BRU, Leachco, and other Retailers.

48.     Certain Retailers, including BabyAge, have, in fact, communicated its acquiescence in, and assurances of compliance with, the Leachco-Retailer Agreements, as a result of Leachco's sought acquiescence and compliance.

49.     BabyAge was terminated (that is, refused supply) by Leachco unambiguously because of, pursuant to, and as a part of the Agreements, and for no other (non-pretextual) reason.  Specifically Around August 2007, Leachco stopped providing any product to BabyAge, pursuant to Leachco's agreement with BRU.

50.     BabyAge did not violate any "non-price" restriction sought by Leachco, whether contained in the Leachco-Retailer Agreements or otherwise.

51.     Leachco did not act unilaterally or independently in entering the BRU-Leachco Agreements, when seeking the Retailers' acquiescence to, and compliance with, the terms of the Leachco-Retailer Agreements, when seeking to have BabyAge charge minimum resale prices, and/or when terminating Retailers, such as BabyAge, for violating the Leachco-Retailer Agreements.

## MONOPOLY/MARKET POWER

52.     The relevant product market in this case is retail sales of high-end baby and juvenile carriers, restraints, pregnancy pillows, bedding, and nursing pillows.  Alternatively, there are several relevant product markets pertinent to this case, including the separate markets for

retail sales of high-end pregnancy pillows, for retail sales of high-end nursing pillows, for retail sales of high-end bedding, for retail sales of high-end infant carriers; and for retail sales of high-end infant restraints.

53. The relevant geographic market in this case is the United States of America.

54. By virtue of its power to control prices and exclude competition in the relevant market(s), BRU at all relevant times possessed monopoly power in the relevant market(s). Moreover, at all relevant times BRU possessed dominant shares of the market(s) for retail sales of high-end baby and juvenile carriers, restraints, pregnancy pillows, bedding, and nursing pillows, respectively, and was a critical outlet for Leachco.

55. Likewise, Leachco at all relevant times each possessed substantial market power in the market(s) for its respective products, due, in part, to the high level of product differentiation in the industry. Leachco is a dominant manufacturer of high-end pregnancy pillows, manufacturing about 95% of high-end pregnancy pillows sold by BabyAge and the other Retailers. Leachco: (a) sold its respective high-end pregnancy pillows, nursing pillows, bedding, infant carriers and restraints at prices in excess of marginal costs, (b) enjoyed high profit margins thereon, (c) sold such products substantially in excess of the competitive price, (d) enjoyed substantial barriers to market entry and growth, and (e) would not, by raising prices for its respective relevant high-end baby and juvenile products a small but significant nontransitory amount, lose sufficient sales to make such a price increase unprofitable. Despite this market power, Leachco was and is nevertheless substantially reliant upon BRU for its respective sales, sales growth, and profitability.

## ANTITRUST INJURY AND OTHER COGNIZABLE HARM

56. Leachco's anticompetitive conduct as hereinbefore described was a material cause of substantial harm to competition, including interbrand competition, in the relevant market(s). The Agreements have made prices for products sold in the relevant market(s) supracompetitive. But for the Agreements, competition would increase, and prices for products sold in the relevant market(s) would fall substantially.

57. Leachco's violations of § 1 of the Sherman Antitrust Act, as herein described, are a material cause of injury to BabyAge's business and property, in the nature of lost profits and the diminished capital value of BabyAge's businesses. Specifically, the Agreements have materially caused BabyAge to enjoy fewer sales and lower profits. But for the Agreements, BabyAge would have enjoyed far greater sales. Indeed, prior to the creation of the Agreements, BabyAge's sales in the affected products were growing at high rates due to low prices, efficient sales practices, and excellent customer service. But, after the imposition of the Agreements, where supply was not terminated entirely, sales growth has either slowed or gone substantially negative in the affected products, which make up a significant part of BabyAge's respective businesses.

58. The Agreements occurred in and/or affected interstate commerce.

## CLAIMS FOR RELIEF

## CLAIM I:  VIOLATION OF 15 U.S.C. § 1 (AGREEMENTS RESTRAINING TRADE)

59. Kiefer hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

60. The Agreements, and each of them, and their enforcement, constitute contracts,

combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), in violation of 15 U.S.C. § 1, and harmed BabyAge thereby.

61.     The Agreements cover a sufficiently substantial percentage of the relevant market(s) to harm competition.

62.     Leachco is liable for the creation, maintenance, and enforcement of the Agreements under a "quick look" and/or rule of reason standard.

63.     BRU and Leachco each possess market power.

64.     The Agreements harmed competition, including interbrand competition, by making prices higher than they would have been but for the Agreements.

65.     There is no legitimate, procompetitive business justification for the Agreements, or any of them, that outweighs its harmful effect.  Even if there were some conceivable such justification, the Agreements are broader than necessary to achieve such a purpose.

## CLAIM II: VIOLATION OF 15 U.S.C. §§ 1 (CONSPIRACY TO MONOPOLIZE)

66.     Kiefer hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

67.     Through the Agreements, BRU and Leachco conspired to maintain and enhance BRU's monopoly power in the relevant market(s).

68.     BRU and Leachco knowingly and intentionally entered into the Agreements.

69.     BRU and Leachco specifically intended that the Agreements would maintain BRU's monopoly power in the relevant market(s), and injured BabyAge thereby.

70.     BRU and Leachco committed at least one overt act in furtherance of the conspiracy.

## ENTITLEMENT TO INJUNCTIVE RELIEF

71.     Kiefer hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

72.     BRU and Leachco's conduct is ongoing, likely to recur, and, unless enjoined, will continue into the future, causing irreparable further injury to BabyAge's business and property.

73.     Kiefer prays that the Court enjoin the Agreements, and their enforcement, pursuant to 15 U.S.C. § 26.

## RELIEF REQUESTED

74.     Kiefer demands the following relief:

A.      Judgment in his favor and against Leachco;

B.      Compensatory damages in an amount in excess of the limits for mandatory arbitration, trebled on the federal antitrust claims;

C.      Punitive and exemplary damages on appropriate claims;

D.      An order or decree permanently enjoining the Agreements and their enforcement;

F.      Costs, including reasonable attorneys' fees;

G.      Pre- and post-judgment interest; and

H.      Such other and/or further relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Kiefer demands a trial by jury on all issues so triable.


Dated: February 1, 2008

/s/ Andrew J. Katsock, III, Esquire
ANDREW J. KATSOCK, III, ESQUIRE
Attorney I.D. 59011
Attorney for Third Party Defendant/
Counterclaim Plaintiff,
John M. Kiefer, Jr.

15 Sunrise Drive
Wilkes-Barre, PA 18705
Telephone & Facsimile No.: (570) 829-5884