UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BABYAGE.COM, INC., | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| | : | 3:07-CV-01600-ARC |
| v. | : | |
| | : | Judge A. Richard Caputo |
| LEACHCO, INC., | : | |
| Defendant | : | Filed Electronically |

## AMENDED COMPLAINT

### THE PARTIES

1.     Plaintiff, BabyAge.com, Inc. ("BabyAge") is a Delaware corporation having its

principal place of business at 360 Stewart Road, Wilkes-Barre, PA 18706.

2.     Defendant C. J. Leachco, Inc. ("Leachco") upon information and belief, is an

Oklahoma corporation maintaining its principal place of business at 130 E. 10th Street, Ada, OK

74820.

### JURISDICTION AND VENUE

3.     This is an action seeking a declaratory judgment that BabyAge's sale of its Cozy

Comfort pillow does not constitute infringement of U.S. Patent No. 6,760,934 for a

Symmetrically Contoured Support Pillow ("the '934 patent").

4.     This Court has subject matter jurisdiction under the provisions of 28 U.S.C.

§§1331 and 1338 in that this action presents claims arising under the laws of the United States, a

claim arising under an act of Congress relating to patents and under the Federal Declaratory

Judgment Act, 28 U.S.C. §§2201 and 2202.

5.     This Court has personal jurisdiction over Leachco in that Leachco advertises and

does substantial business in the Commonwealth of Pennsylvania.

6.     Venue is proper in this judicial district under 28 U.S.C. §1391.

## COUNT I - PLAINTIFF'S CLAIM FOR DECLARATORY RELIEF

7.     BabyAge is an on-line retailer of pregnancy, baby, infant and toddler products.

8.     Leachco, on information and belief, is a manufacturer of pregnancy and baby products.

9.     By letter dated April 3, 2007, Leachco's counsel delivered to BabyAge a letter accusing BabyAge's Cozy Comfort pillow of infringing the '934 patent and an unqualified demand that BabyAge cease selling its Cozy Comfort pillow and pay Leachco unspecified damages. Attached as Exhibit A is a copy of the letter. A copy of the '934 patent is attached as Exhibit B and a photograph of the Cozy Comfort pillow is attached as Exhibit C.

10.     BabyAge categorically denies that its Cozy Comfort pillow infringes the '934 patent.

11.     The Cozy Comfort pillow is in the form of a rectangle, with legs that extend straight downward and a top portion that extends straight across.

12.     The Cozy Comfort pillow does not have a semi-circular crown as required by the '934 patent.

13.     The Cozy Comfort pillow does not have legs that extend downwardly and outwardly divergently away from the crown as required by the '934 patent.

14.     The claims of Leachco create an immediate and actual controversy between these parties, requiring determination by a Court of competent jurisdiction. BabyAge seeks that determination by filing this action.

15.     Leachco's assertions that BabyAge is violating its legal rights irreparably injures and adversely affects BabyAge and unless prevented by this Court will continue to so affect BabyAge's business.

16.     To resolve the legal and factual questions raised by Leachco and to afford relief from the uncertainty and controversy which Leachco's assertion has precipitated, BabyAge is entitled to a declaratory judgment of its rights under 28 U.S.C. §§ 2201-02.  The sale of the Cozy Comfort pillow by BabyAge is not in violation of any rights Leachco might have pursuant to 35 U.S.C. § 281 *et seq*.

WHEREFORE, Plaintiff requests the Court to issue its adjudication, declaring that:

(A)     The Cozy Comfort pillow does not infringe the '934 patent;

(B)     The '934 patent is invalid;

(C)     Leachco does not have a basis to enjoin BabyAge from selling its Cozy Comfort pillow;

(D)     BabyAge has the right to sell its Cozy Comfort pillow free from interference by Leachco, its officers, agents, servants, employees, attorneys, privies, representatives, successors, and assigns, and any and all persons acting by, through, or under authority from Leachco, either separately or jointly;

(E)     Leachco, its officers, agents, servants, employees, attorneys, privies, representatives, successors, and assigns, and any and all persons in active concert or participation with or under authority from Leachco, either separately or jointly, be enjoined permanently from:

1)     Interfering with, or threatening to interfere with the manufacture, sale or use of the Cozy Comfort pillow by BabyAge, its related companies, successors, assigns or customers;

2) Instituting or prosecuting any suit or other proceeding placing in issue the right of BabyAge or its related companies, successors, assigns or customers to make, sell or use the Cozy Comfort pillow;

and

(F)     Such other relief as the Court deems appropriate under all the circumstances.

## COUNT II - PLAINTIFF'S CLAIMS OF ANTITRUST VIOLATIONS

17.     BabyAge hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

### INTRODUCTION

18.     BabyAge is a highly-efficient internet-based baby and juvenile product retailer. BabyAge seeks to obtain damages and equitable relief from Leachco under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  As detailed below, BabyAge alleges that Babies 'R' Us ("BRU"), a dominant, multibrand retailer, coerced and induced Leachco to agree to enter into, maintain, and enforce minimum resale price maintenance agreements with retailers of such products, including BabyAge and others (the "Retailers").  The Leachco-Retailer Agreements prevented the Retailers, on penalty of termination (*i.e.*, being refused supply), from charging prices that were lower than the agreed minimum prices.

19.     Leachco is a manufacturer of high-end pregnancy pillows, nursing pillows, baby carriers, and restraints.  The relevant high-end products manufactured by Leachco are carried by specialty baby retailers such as BabyAge and BRU.  Leachco is a dominant manufacturer of high-end pregnancy pillows.  Leachco also manufacturers nursing pillows, bedding, baby carriers, and restraints.

20.     Both the BRU-Leachco Agreements and the resulting Leachco-Retailer

-4-

Agreements are comprised of contracts, combinations and/or conspiracies, whether oral or written, express or tacit.

21.     The Agreements, and each of them, unreasonably restrain trade in the relevant market(s) (defined below), causing substantial anticompetitive effects and net losses in consumer welfare, in violation of § 1 of the Sherman Act.

22.     Moreover, the Agreements were part and parcel of an anticompetitive scheme under which BRU leveraged its substantial market power and dominance to induce Leachco into agreeing to (a) impose and/or amend minimum resale price maintenance agreements on the Retailers, including on internet discounters like BabyAge, (b) enforce and/or heighten enforcement of those agreements against BabyAge and other Retailers, but not against BRU, (c) otherwise prevent Retailers from discounting the relevant products and/or protect BRU from having to suffer the profit-lowering effects of retail price competition, and (d) cut off supply to price-cutting retailers like BabyAge.  Through this scheme, BRU agreed and conspired with Leachco to fix prices at artificially high levels, unreasonably restrain trade, and to illegally maintain and enhance BRU's monopoly power.

23.     The Agreements, and the scheme in restraint of trade of BRU and Leachco, have harmed competition, including interbrand competition, in the relevant market(s) and caused prices to be higher in the relevant market(s) than they otherwise would have been.  The Agreements were specifically intended to protect BRU from price competition from highly efficient retailers like BabyAge by either mandating higher price levels, and thereby neutering the competition, or by eliminating the price-cutting competition entirely.  The Agreements were also part of BRU's monopolistic scheme, which was designed to preserve and enhance BRU's market dominance and monopoly power.  This scheme achieved its goals, and thereby excluded and

frustrated competitors, such as BabyAge, substantially inflated prices to consumers, and reduced consumer welfare.

24.     Because BabyAge is a highly efficient internet retailer, BabyAge wins sales and grows its businesses by dropping its prices lower than those of competitors (such as BRU). Conversely, BabyAge loses sales if it is prevented from dropping its prices lower than competitors such as BRU, or if it is cut off from supply entirely.  Thus, the Agreements and Leachco's scheme has injured BabyAge by (a) depriving BabyAge of sales and profits that BabyAge would otherwise have garnered, and (b) diminishing of the capital value of BabyAge's business.  The Agreements and Leachco's conduct impairs BabyAge's ability to compete with BRU and to take sales from BRU by preventing BabyAge from exploiting its highly efficient business model and/or by cutting it off entirely for the offense of cutting prices below agreed levels.  In fact, prior to the imposition of the Agreements, BabyAge was rapidly growing its sales of the relevant products through, among other things, aggressive price competition.  However, the Agreements and other alleged conduct of Leachco was intended to, and did, reverse those trends, and substantially harmed BabyAge thereby.

## FACTS

25.     BRU is a dominant, multibrand retailer of baby and juvenile products, which opened its first stores in 1996.  As of January of 2005, BRU operated over 200 Babies "R" Us stores throughout the United States.  In a recent form 10-Q filing with the United States Securities and Exchange Commission, BRU stated that it considers itself the "largest specialty retailer of baby-juvenile products in the United States" and the "only specialty retailer in its category that operates on a national U.S. scale."

26.     BRU sells juvenile furniture, such as cribs, dressers, changing tables; bedding and

related accessories; baby gear, such as play yards, booster seats, high chairs, strollers, and car seats; baby carriers and restraints, toddler and infant plush toys; gifts; clothing; infant feeding supplies; health and beauty aids; pregnancy and nursing pillows, and infant care products. In addition to its stores, BRU retails over the internet at www.babiesrus.com, a site administered by and with Amazon.com.

27.     Relative to BRU, BabyAge is a small company that competes in the relatively new, innovative trade channel known variously as "electronic commerce," "e-commerce," "e-tailing," "internet retail," *etc.* Specifically, BabyAge is an internet retailer of high-end baby and juvenile products. BabyAge is a highly efficient competitor because, among other reasons, its operating expenses are low. This allows BabyAge to compete vigorously on price, both with other internet retailers and with retailers in other trade channels, such as BRU (which operates through "brick and mortar" stores as well as on the internet). Like many other efficient internet retailers, BabyAge wins sales by dropping its prices lower than those of competitors such as BRU; conversely, BabyAge loses sales if BabyAge is prevented from dropping its prices lower than those of competitors (or if it is prevented from getting supply of key products like those sold by the Leachco).

28.     When allowed to compete freely, the price competition in which BabyAge and other internet retailers engage enhances consumer welfare by bringing down prices. For instance, if BabyAge's competitors, such as BRU, did not lower its prices to match or beat BabyAge's prices, those competitors would lose sales to BabyAge. This is a classic example of the pro-competitive benefits of price competition.

29.     BRU has known, since the late 1990s, that the increasing popularity of "e-commerce," with its associated increase in price competition, would pose a substantial threat to

BRU's sales and profits. For example, recently BRU has made public statements admitting its fear of price competition from efficient competitors like BabyAge. In January of 2005, BRU wrote in a form 10-K filing that "[s]ome of our competitors may have greater financial resources, lower merchandise acquisition costs, and lower operating expenses than our Company. If we fail to compete successfully, we could face lower net sales and may decide to offer *greater discounts to our guests*, which could result in *decreased profitability*" (emphasis added).

30. BRU thus stated its fears that competitors like BabyAge would force it to give greater discounts to its customers and thereby lower BRU's profits. BRU reacted aggressively to this important threat to its pricing freedom and profitability. BRU sought to avoid such competitive constraints on its ability to garner increased sales volume and inflated prices.

31. The tremendous pressure upon a dominant retailer (like BRU) in a traditional trade channel (like the "brick and mortar" trade channel) to react anticompetitively to threats to its pricing freedom, such as those posed by retailers in a new and efficient trade channel (like BabyAge), have been the subject of study by, and recent testimony before, the Federal Trade Commission ("FTC"). As one participant in the FTC's 2002 public workshop, entitled "Possible Anticompetitive Efforts to Restrict Competition on the Internet," stated:

> The promise of the world of electronic commerce is to create an environment where consumers can freely shop between various competitive alternatives. By reducing transaction costs and improving transparency, the Internet offers the potential of dramatically improving competition in various retail markets.
>
> * * * [But] *as new market forces arise, . . . "traditional" competitors often respond to the threat by trying to create barriers to thwart those new entrants.*

*See* David A. Balto, Testimony Before the FTC, Office of Policy Planning, Public Workshop on E-Commerce, at 1-2 (October 10, 2002) (emphasis added).

32.     Leachco sells substantial shares, respectively, of its total volume of the products at issue through BRU, and thus has become increasingly dependent upon BRU for its businesses.

33.     Because suppliers of products (like Leachco) depends on retailers (like BRU) to sell its products, it is not surprising that a dominant retailer like BRU would use that dominance to protect against price competition by coercing suppliers like Leachco into disadvantaging retailers (like BabyAge) in the new, efficient trade channel.

34.     For instance, speaking at that same FTC public workshop, FTC Commissioner Sheila Anthony underscored the potential threat to competition posed by a dominant retailer (like BRU), whom suppliers (like Leachco) cannot do without.  The concern is that a dominant retailer like BRU could use its market power to coerce key suppliers into disadvantaging competing retailers (like BabyAge), and thereby protect and preserve its market dominance:

> Competition among distributors for a given manufacturer's favor is almost certainly healthy.  But problems may arise where distributors in one channel exercise its market power to disadvantage distributors in another channel. * * * [C]an Internet distribution ever gain a strong foothold in some product areas where the entrenched distribution channel, members who manufacturers cannot do without, at least until e-commerce matures, use hardball tactics to make sure that the transition period never begins?

*See* FTC, Public Workshop:  Possible Anticompetitive Effects to Restrict Competition on the Internet, transcript of proceedings, at 797:12-16, 799:7-12 (October 10, 2002) (remarks of Commissioner Shiela F. Anthony).

35.     Indeed, because of BRU's position as a dominant multibrand retailer in the relevant market(s), BRU was able to, and did, induce and require the creation of the BRU-Leachco Agreements.  Among the relevant provisions of the BRU-Leachco Agreements was that, in consideration of BRU's starting (or continuing) to stock and sell the products manufactured by

Leachco, Leachco had to ensure that Retailers, such as BabyAge and others, would, on penalty of termination, charge a minimum resale price for the products supplied to them by Leachco.

36.     Upon information and belief, BRU sold about $4.5 million worth of Leachco product in 2005, and made up about 30% of Leachco's business.

37.     Sometime around May, 2006, in a meeting and in a letter, Marsha Costello of BRU told Clyde Leach that a condition of BRU's buying Leachco products for resale through BRU was Leachco's ensuring that all of Leachco's other Retailer customers refrained from discounting Leachco's products.

38.     Leachco agreed with BRU that it would ensure that all other Retailer customers of Leachco, and especially internet retailers such as BabyAge, would not discount Leachco products. In return, BRU agreed to pay Leachco's increased wholesale prices.

39.     Prior to July 2006, Leachco never set minimum resale prices, or had an internet pricing policy, or any other type of pricing policy.

40.     On or about July 7, 2006, as a result of its agreement with BRU, Leachco presented BabyAge with its new internet pricing policy, which it said BabyAge would have to sign if it wanted to receive any more product from Leachco.

41.     Prior to BabyAge signing any agreement with Leachco, Leachco told BabyAge that other Retailers, including Baby Universe, had signed agreements not to discount Leachco products.

42.     Leachco withheld product from BabyAge until BabyAge returned a signed internet pricing policy to Leachco.

43.     On or about July 7, 2006, BabyAge signed the Leachco internet policy and sent it to Leachco, along with a cover letter which objected to the minimum pricing policy.

44.     From July 2006 to August 2007, Leachco attempted to prohibit BabyAge from discounting Leachco product by, *inter alia*, threatening to withhold product from BabyAge, pursuant to Leachco's agreement with BRU

45.     Around August 2007, Leachco stopped providing any product to BabyAge, pursuant to Leachco's agreement with BRU.

46.     BRU required Leachco to impose minimum resale pricing with respect to Leachco's other Retailers (i.e. BRU's retailer competitors), in a form that met with BRU's prior approval, and Leachco acquiesced to such demands.

47.     BRU was not similarly required to comply with minimum resale pricing but instead charged retail prices that were effectively just slightly lower than the prices at which BRU required Leacho to ensure the other Retailers were selling (but which were far higher than the retail prices at which BRU could profitably sell but for the conduct challenged in this lawsuit).

48.     BRU dictated terms and conditions under which Leachco had to do business with its other Retailers (i.e., BRU's retailer competitors), and Leachco agreed to same, including dictating the resale prices such other Retailer customers of Leachco had to charge for Leachco products, and dictating who the Retailer customers of Leachco would, and would not, be.

49.     BRU engaged in extensive retail price surveillance to ensure that Leachco was not in breach of the BRU-Leachco Agreement, and Leachco, fearful of being found in breach, did so as well.

50.     BRU and Leachco together co-developed strategies to insulate BRU from having to engage in profit-lowering retail price competition.

51.     Leachco then, pursuant to its agreement with BRU, entered into the Leachco-

-11-

Retailer Agreement, including the agreement with BabyAge. Among the relevant provisions of the Leachco-Retailer Agreements was that, in consideration of Leachco continuing to supply the Retailers with product, the Retailers were prohibited, on penalty of termination, from lowering, past a certain price floor, the prices at which they sold Leachco's goods to consumers.

52.     The Leachco-Retailer Agreements came about not through the independent conduct of Leachco, but instead at BRU's request and demand, and as a result of the BRU-Leachco Agreement.

53.     As to the provisions of the Leachco-Retailer Agreement, BRU was the undisclosed principal of Leachco.

54.     BRU caused the Leachco-Retailer Agreements to be created, maintained, and enforced to further its dominance in the relevant market(s), and for the clearly anticompetitive purposes of earning excess profits and eliminating and/or insulating itself from price competition from other Retailers, such as BabyAge herein.

55.     The Leachco-Retailer Agreement directly benefited BRU.

56.     At the behest of BRU, which threatened Leachco with termination (*i.e.*, being deprived of the ability to continue (or start) to retail the relevant products through BRU) if it did not enter into the Agreement, Leachco maintained and enforced the Leachco-Retailer Agreements, and did so in a complex manner, often utilizing intermediaries.

57.     Specifically, Leachco, by and through its various representatives, and specifically pursuant to the BRU-Leachco Agreements, (a) met with, exhorted, threatened, warned, cajoled, and/or negotiated with Retailers, including BabyAge herein, on an individualized basis, concerning the prices at which the Retailers sold its products, (b) sought the Retailers' acquiescence to, and assurances of, compliance with the terms of the Leachco-Retailer

-12-

Agreements, (c) threatened the Retailers with termination of product supply for noncompliance, and (d) on certain occasions did in fact terminate Retailers.

58.     The acquiescence and compliance by Retailers (like BabyAge) in minimum pricing, was, to Leachco, preferable to termination or non-supply of noncompliant Retailers, because Leachco wanted, and profited from, sales to the Retailers.

59.     The creation and enforcement of the Leachco-Retailer Agreements was orchestrated by BRU.  Thus, Leachco did *not* simply or unilaterally:

        (a)    refrain from selling to uncongenial Retailers;

        (b)    suggest resale prices that were widely followed;

        (c)    sanction and/or terminate Retailers who failed to maintain a minimum resale price;

        (d)    announce and enforce policies of sanctioning and/or terminating Retailers who failed to maintain a minimum resale price; or

        (e)    sanction and/or terminate other Retailers following, or in response to, complaints by Retailers such as BRU.

60.     The Agreements represent a conscious commitment to a common scheme, designed to achieve an unlawful objective, between BRU, Leachco, and other Retailers.

61.     Certain Retailers, including BabyAge, have, in fact, communicated its acquiescence in, and assurances of compliance with, the Leachco-Retailer Agreements, as a result of Leachco's sought acquiescence and compliance.

62.     BabyAge was terminated (that is, refused supply) by Leachco unambiguously because of, pursuant to, and as a part of the Agreements, and for no other (non-pretextual) reason.  Specifically Around August 2007, Leachco stopped providing any product to BabyAge,

pursuant to Leachco's agreement with BRU.

63.    BabyAge did not violate any "non-price" restriction sought by Leachco, whether contained in the Leachco-Retailer Agreements or otherwise.

64.    Leachco did not act unilaterally or independently in entering the BRU-Leachco Agreements, when seeking the Retailers' acquiescence to, and compliance with, the terms of the Leachco-Retailer Agreements, when seeking to have BabyAge charge minimum resale prices, and/or when terminating Retailers, such as BabyAge, for violating the Leachco-Retailer Agreements.

## MONOPOLY/MARKET POWER

65.    The relevant product market in this case is retail sales of high-end baby and juvenile carriers, restraints, pregnancy pillows, bedding, and nursing pillows.  Alternatively, there are several relevant product markets pertinent to this case, including the separate markets for retail sales of high-end pregnancy pillows, for retail sales of high-end nursing pillows, for retail sales of high-end bedding, for retail sales of high-end infant carriers; and for retail sales of high-end infant restraints.

66.    The relevant geographic market in this case is the United States of America.

67.    By virtue of its power to control prices and exclude competition in the relevant market(s), BRU at all relevant times possessed monopoly power in the relevant market(s). Moreover, at all relevant times BRU possessed dominant shares of the market(s) for retail sales of high-end baby and juvenile carriers, restraints, pregnancy pillows, bedding, and nursing pillows, respectively, and was a critical outlet for Leachco.

68.    Likewise, Leachco at all relevant times each possessed substantial market power in the market(s) for its respective products, due, in part, to the high level of product

differentiation in the industry. Leachco is a dominant manufacturer of high-end pregnancy pillows, manufacturing about 95% of high-end pregnancy pillows sold by BabyAge and the other Retailers. Leachco: (a) sold its respective high-end pregnancy pillows, nursing pillows, bedding, infant carriers and restraints at prices in excess of marginal costs, (b) enjoyed high profit margins thereon, (c) sold such products substantially in excess of the competitive price, (d) enjoyed substantial barriers to market entry and growth, and (e) would not, by raising prices for its respective relevant high-end baby and juvenile products a small but significant nontransitory amount, lose sufficient sales to make such a price increase unprofitable. Despite this market power, Leachco was and is nevertheless substantially reliant upon BRU for its respective sales, sales growth, and profitability.

## ANTITRUST INJURY AND OTHER COGNIZABLE HARM

69.     Leachco's anticompetitive conduct as hereinbefore described was a material cause of substantial harm to competition, including interbrand competition, in the relevant market(s). The Agreements have made prices for products sold in the relevant market(s) supracompetitive. But for the Agreements, competition would increase, and prices for products sold in the relevant market(s) would fall substantially.

70.     Leachco's violations of § 1 of the Sherman Antitrust Act, as herein described, are a material cause of injury to BabyAge's business and property, in the nature of lost profits and the diminished capital value of BabyAge's businesses. Specifically, the Agreements have materially caused BabyAge to enjoy fewer sales and lower profits. But for the Agreements, BabyAge would have enjoyed far greater sales. Indeed, prior to the creation of the Agreements, BabyAge's sales in the affected products were growing at high rates due to low prices, efficient sales practices, and excellent customer service. But, after the imposition of the Agreements,

where supply was not terminated entirely, sales growth has either slowed or gone substantially negative in the affected products, which make up a significant part of BabyAge's respective businesses.

71.    The Agreements occurred in and/or affected interstate commerce.

## CLAIMS FOR RELIEF

### CLAIM I:  VIOLATION OF 15 U.S.C. § 1 (AGREEMENTS RESTRAINING TRADE)

72.    BabyAge hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

73.    The Agreements, and each of them, and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), in violation of 15 U.S.C. § 1, and harmed BabyAge thereby.

74.    The Agreements cover a sufficiently substantial percentage of the relevant market(s) to harm competition.

75.    Leachco is liable for the creation, maintenance, and enforcement of the Agreements under a "quick look" and/or rule of reason standard.

76.    BRU and Leachco each possess market power.

77.    The Agreements harmed competition, including interbrand competition, by making prices higher than they would have been but for the Agreements.

78.    There is no legitimate, procompetitive business justification for the Agreements, or any of them, that outweighs its harmful effect.  Even if there were some conceivable such justification, the Agreements are broader than necessary to achieve such a purpose.

### CLAIM II: VIOLATION OF 15 U.S.C. §§ 1 (CONSPIRACY TO MONOPOLIZE)

79.    BabyAge  hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

80.    Through the Agreements, BRU and Leachco conspired to maintain and enhance BRU's monopoly power in the relevant market(s).

81.    BRU and Leachco knowingly and intentionally entered into the Agreements.

82.    BRU and Leachco specifically intended that the Agreements would maintain BRU's monopoly power in the relevant market(s), and injured BabyAge thereby.

83.    BRU and Leachco committed at least one overt act in furtherance of the conspiracy.

## ENTITLEMENT TO INJUNCTIVE RELIEF

84.    BabyAge hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

85.    BRU and Leachco's conduct is ongoing, likely to recur, and, unless enjoined, will continue into the future, causing irreparable further injury to BabyAge's business and property.

86.    BabyAge prays that the Court enjoin the Agreements, and their enforcement, pursuant to 15 U.S.C. § 26.

## RELIEF REQUESTED

87.    BabyAge demands the following relief:

   A.    Judgment in its favor and against Leachco;

   B.    Compensatory damages in an amount in excess of the limits for mandatory arbitration, trebled on the federal antitrust claims;

   C.    Punitive and exemplary damages on appropriate claims;

   D.    An order or decree permanently enjoining the Agreements and their enforcement;

-17-

F.   Costs, including reasonable attorneys' fees;

G.   Pre- and post-judgment interest; and

H.   Such other and/or further relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

BabyAge demands a trial by jury on all issues so triable.


Dated:  March 4, 2008                          /s/ Andrew J. Katsock, III, Esquire
                                               ANDREW J. KATSOCK, III, ESQUIRE
                                               Attorney I.D. 59011
                                               Attorney for Plaintiff, BabyAge.com, Inc.

15 Sunrise Drive
Wilkes-Barre, PA  18705
Telephone & Facsimile No.:  (570) 829-5884

**EXHIBIT A**

{00005020.DOCX; 1}

### LAW OFFICE
## MARY M. LEE, P.C.
#### 1300 E. NINTH STREET, SUITE 4
#### EDMOND, OKLAHOMA 73034-5760

Telephone: (405) 285-4490                                      Email: mml@marymlee.com
Facsimile: (405) 285-4491                                      http://www.marymlee.com

*Patent, Trademark, Copyright and Related Matters*

April 3, 2007

*VIA FACSIMILE and*
*CERTIFIED MAIL – RETURN RECEIPT REQUESTED*

Jack Kiefer, President
BABYAGE.COM, INC.
360 Stewart Road
Wilkes-Barre, PA 18706

     Re:    U.S. Patent No. 6,760,934
              For: Symmetrically Contoured Support Pillow
              My File No. 4400-022

Dear Mr. Kiefer:

I represent C.J. Leachco, Inc., of Ada, Oklahoma, in patent and trademark matters. As you know, Leachco markets maternity and baby products to retailers nationwide, including the BACK 'N BELLY body pillow. This product is covered by the above-referenced patent, a copy of which is enclosed. I am not providing a sample of this product, as you are one of Leachco's customers and sell this product on your website.

We have learned that BabyAge recently began selling a competitive product under the name "Today's Mom Cozy Comfort." The Cozy Comfort pillow is practically identical to Leachco's BACK 'N BELLY pillow and infringes the '934 patent. We, therefore, ask that BabyAge immediately cease selling the Cozy Comfort pillow. In addition, we will require that you pay Leachco an amount to compensate for the infringing sales and the attorney fees incurred because of this infringement. To that end, please provide us with copies of your sales records from which the number of infringing pillows sold can be determined.

Please let me have your response within fifteen (15) business days.

Yours truly,

Mary M. Lee

MML/jbw

Enclosure

**EXHIBIT B**

-8-



US006760934B1

(12) **United States Patent**

Leach

(10) Patent No.: **US 6,760,934 B1**
(45) Date of Patent: **Jul. 13, 2004**

(54) **SYMMETRICALLY CONTOURED SUPPORT PILLOW**

(76) Inventor: **Jamie S. Leach**, P.O. Box 717, Ada, OK (US) 74820

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/640,622**

(22) Filed: **Aug. 14, 2003**

(51) Int. Cl.$^7$ ............................................. **A47G 9/00**
(52) U.S. Cl. ................................. **5/632; 5/631; 5/930**
(58) Field of Search .......................... 5/632, 631, 930, 5/636, 640, 644; D6/601, 596

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,795,802 A | 6/1957 | Myers | 5/632 |
| D201,492 S | 6/1965 | Jacobson | D6/601 |
| 4,173,048 A | 11/1979 | Varaney | 5/636 |
| 4,236,264 A | * 12/1980 | Britzman | 5/644 |
| 5,026,315 A | 6/1991 | Chap | D6/601 |
| 5,647,076 A | 7/1997 | Gearhart | 5/631 |
| 5,978,990 A | 11/1999 | Akey | 5/632 |

| | | | |
|---|---|---|---|
| 5,987,674 A | 11/1999 | Schaffner et al. | 5/630 |
| D420,845 S | 2/2000 | Rumage | D6/601 |
| 6,052,848 A | 4/2000 | Kelly | 5/632 |
| 6,088,854 A | 7/2000 | Brownrigg | 5/632 |
| 6,499,164 B1 | 12/2002 | Leach | 5/632 |

* cited by examiner

*Primary Examiner*—Alexander Grosz
(74) *Attorney, Agent, or Firm*—William S. Dorman

(57) **ABSTRACT**

A symmetrical contoured support pillow formed essentially in an inverted U-shape, comprising essentially a semi-circular crown designed to support the head of a woman and a pair of spaced symmetrical legs extending downwardly and outwardly divergently away from the crown, the legs having lower ends which are curved inwardly towards each other and forming toes, each leg having a convex bulge extending inwardly in the space between the two legs, the bulges extending towards each other, the resulting space between the legs as formed by the convex bulges being essentially in the shape of an hourglass, the woman lying between the legs of the pillow on her side such that one of the bulges is received in a curvature of the back of the woman whereas the other bulge is received in a tummy area of the woman.

**3 Claims, 4 Drawing Sheets**





*Fig. 1*



*Fig. 2*



*Fig. 3*



*Fig. 4*



*Fig. 5*



**Fig. 6**

**Fig. 7**

# SYMMETRICALLY CONTOURED SUPPORT PILLOW

## FIELD OF THE INVENTION

The present invention relates to a symmetrically contoured support pillow. More particularly, the present invention involves a contoured stuffed pillow having symmetrically contoured sides to provide support to an adult in a sleeping position or cradle an expectant mother, each in a variety of positions, without having to adjust the pillow to obtain the correct relationship.

## PRIOR ART

A preliminary search was conducted on the present invention and the following patents were uncovered in the search.

| Patent No. | Inventor | Date |
|---|---|---|
| 6,499,164 | Leach | Dec. 31, 2002 |
| 6,088,854 | Brownrigg | Jul. 18, 2000 |
| 6,052,848 | Kelly | Apr. 25, 2000 |
| 5,987,674 | Schaffner, et al. | Nov. 23, 1999 |
| 5,978,990 | Akey | Nov. 9, 1999 |
| 5,647,076 | Gearhart | Jul. 15, 1997 |
| 5,026,315 | Chap | Jun. 25, 1991 |
| 4,173,048 | Varaney | Nov. 6, 1979 |
| 2,795,802 | Myers | Jul. 9, 1951 |
| D420,845 | Rumage | Feb. 22, 2000 |
| D201,492 | Jacobson | Jun. 29, 1965 |

The Kelly Pat. No. 6,065,848 does not show the contours of the inner design of the present invention. Kelly is simply a U-shaped pillow with straight edges and does not conform by way of shape to the user's body. The instant pillow is convex shaped on the inner mid sections making it conform to the body and allows for greater back or belly support. The ends of the pillow allow it to turn inward and meet which provides for even greater support without having to constantly reposition the pillow. In Kelly, the ends are straight and not curved. Kelly requires a band to have it pulled inward, where the instant pillow, by the way it is shaped, naturally curves inward at the ends.

The Brownrigg Pat. No. 6,088,854, again, is just a straight form of an elongated pillow that has to be folded and pulled inward to achieve the amount of support or shape that the user desires. It appears to also have to use a separate traditional pillow for head support. The instant pillow has its own head pillow in the form of a semi-circular crown at the upper part of the pillow.

Leach Pat. No. 6,499,164 does not allow for equal amounts of tummy and back support simultaneously. While there are features of the Leach pillow, such as the horseshoe shaped top, and the J-shaped bottom that does curve around and provide support and cushioning, it is not equal on both sides as the instant pillow is. With the present invention, the user can lie on her right side and receive the same amount of the support as if she were turned on the opposite side. Also, the inner columnar section of the Leach pillow does not have a convex section which fits into the user's lower back, or neck area if the pillow were turned 180 degrees.

Rumage Pat. D420,845 is a design patent and, again, reference should be made to the distinguishing features outlined in relation to Kelly and Brownrigg. The inner section of the pillow is straight and has no convex shape that would fit snugly into the user's lower back or abdomen. Also

the ends are rounded and do not come inward towards themselves. They are straight and open. The instant pillow naturally comes together towards itself, with a spring like quality. The Rumage pillow is for the neck and does not have any full body benefits.

Myers Pat. No. 2,795,802 is should be considered in light of the above comments regarding Kelly and Brownrigg.

Jacobson Pat. No. D201,492 is also a design patent and is asymmetrical in its features. It does not support the entire body simultaneously as the instant pillow does, and cannot be crossed over at the ends to provide additional elevation.

Varaney Pat. No. 4,173,048 is quite similar to the Kelly patent. There are no convex contours and the ends are open and not spring-like. Limited support is achieved since it does not conform to the body, but is straight and must be tucked around the body to achieve any level of snugness or support.

Chap Pat. No. 5,026,315 is a toy and not a sleeping device. It has no full body features. The ends are round and open and do not meet. The inner section is straight.

Gearhart Pat. No. 5,647,076 is broadly similar to Kelly and Brownrigg as to one part of the two piece pillow. The Gearhart pillow is designed for a person to lie in the prone or face down position. Also, an extra piece is used to make the pillow widen.

Schaffner et al., Pat. No. 5,987,674 is a non-symmetrical pillow. If the user turns from side to side, she does not receive the same amount of support while turning, as she does with the instant pillow. A pregnant woman must lie on her side predominately during the last few months of her pregnancy. The instant pillow allows her to rest comfortably whether she is on her left side or right side with the same amount of support simultaneously. The side "mirror" each other. The Schaffner pillow does not allow the user to double the ends over each other to achieve greater elevation. It is limited in the amount of full body support it provides.

The Akey Pat. No. 5,978,990 has several separate attachments and extensions. The extensions must be moved and separated from the main pillow to achieve the desired amount of support. The instant pillow is all one piece and the user can pull each independent section closer to the body without having to disengage the pillow as with the Akey patent. Akey does not show an convex bulges.

## SUMMARY OF THE INVENTION

The present invention involves an inverted "U"-shaped pillow, the upper end of which is formed by a semi-circular crown for the user's head to rest against. There are two symmetrically and downwardly extending legs which represent the legs of the "U". The legs of the inverted U extend divergently outward and downwardly and terminate in a pair of toes that are curved inwardly towards each other such that they essentially abut or touch each other. The legs are further provided convex bulges essentially midway of the length of the legs, and these bulges project inwardly towards each other. The resulting effect of the inner shape of the opening between the legs resembles a hourglass.

The pillow of the present invention allows the user to sleep on the right or left side without having to reposition, tie, secure or disengage anything from the pillow. Many women are required by their shapes, in the latter part of their pregnancies, to sleep on the side and not on the back as the extra weight and pressure of the baby presses down on the vena cava and disturbs normal blood flow. By sleeping on the side, especially on the left side, it allows normal blood flow and does not cause pressure on the large blood vessels

that run posterior to the uterus. The pillow of the present invention allows a person to turn from side to side without having to reposition anything. The convex bulges naturally fit inwardly to the body, back and tummy, and the toes, which curve inwardly, hold the legs in place. If the user desires to turn the pillow up side down, the user can double over the toes and elevate the pillow to get the effect of using two pillows (toes)under the head.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a plan view of a contoured body pillow of the present invention in its normal position.

FIG. 2 is a cross-sectional view through the legs of the contoured body pillow of FIG. 1 taken along section line 2—2 of FIG. 1.

FIG. 3 is a view similar to FIG. 1 but showing the lower ends of the legs in a slightly overlapping condition.

FIG. 4 is a perspective view of a young woman lying on her left side on the contoured pillow of FIG. 3 with her head resting on the overlapping portions.

FIG. 5 is a perspective view of a young female lying on the contoured pillow of FIG. 3 on her right side, with her head resting on the crown of the contoured pillow and her legs lying over the ends of the legs of the pillow.

FIG. 6 is a perspective view of a young woman lying her left side on the contoured pillow with her head resting on the crown of the pillow and her legs straddling one of the legs of the pillow; and

FIG. 7 is a perspective view of a young woman lying on the contoured pillow with her head resting on the crown and her body extending at full length between the ends of the legs of the pillow.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to the drawings in detail, FIG. 1 shows a symmetrically contoured support pillow 10 consisting essentially of a semi-circular crown 12 for the user's head to rest against, two symmetrical and downwardly extending legs 14 and 16 having inner protuberances 18 and 20 at the respective ends of the legs. For the sake of convenience, the protuberances 18 and 20 will also hereinafter be referred to as "toes". In the "normal" position of the pillow shown in FIG. 1, the toes 18 and 20 will be just touching each other.

The pillow 10 is designed to accommodate the natural curves of the body (of a woman), to provide support for the back, hips, and/or the stomach of a pregnant woman and to permit the woman to change her resting or sleeping position without having to adjust or reposition the pillow. Alternatively, the pillow can be wrapped around the user in a seated position with the semi-circular crown 12 encircling the stomach area of the user and the downwardly extending legs 14 and 16 being wrapped around the sides of the user with the toes at the ends thereof connecting behind the user to provide back support. The toes 18 and 20 can also function as a head support when overlapped, with the semi-circular crown 12 being positioned between the legs of the user.

The leg 14, on its inner aspect, is provided with a convexly curved bulge 22 while the leg 16, on its inner aspect, is provided with a similarly shaped convex bulge 24 which extends towards the bulge 22 in opposition thereto. The net effect of the symmetrical bulges 22 and 24, considered in light of the space between the arms 14 and 16, is to provide a somewhat hourglass shape 26 between the two

legs 14 and 16. The pillow 10 can be stuffed with conventional batting, resilient polyester fiberfill, polystyrene foam beads or any other convenient stuffing material for pillows, as indicated by the reference numeral 28; or it could be manufactured with an inflatable pillow liner and have a cover over the inflatable portion. If desired, the pillow itself could be made of inflatable material. A removable and washable cover (not shown) can be provided as desired.

As best shown in FIG. 3, the lower ends of the legs 14 and 16 have been moved closer to each other so that the toes 18 and 20 overlap each other.

With further respect to the position of the pillow 10 show in FIG. 3, FIG. 4 shows a woman 30 with her head positioned over the overlapping toes 18 and 20 of the pillow and with her legs straddling the semi-circular arch 12 of the pillow.

FIG. 5 shows a woman 30 with her head resting on the semi-circular arch 12 and with her legs extending down between the lower ends of the legs 14 and 16. In FIG. 5, the bulge 22 is received against the woman's tummy while the bulge 24 rest against the back of the woman.

FIG. 6 shows a woman 30 resting on the pillow 10 in essentially the opposite mode from that shown in FIG. 5, with the exception that the legs of the woman are wrapped around the leg 16 of the pillow 10. The bulge 22 of the pillow shown in FIG. 6 is resting against the curvature of the back of the woman while the opposite bulge 24 (obscured in this view) rests against the tummy of the woman.

FIG. 7 is a view of the woman 30 with her body fully extended. The woman's head in FIG. 7 is resting against the semi-circular crown 12 while the legs of the woman extend beyond the ends of the legs 14 and 16 and beyond the toes 18 and 20 of these legs.

It can be seen from the above that the pillow of the present invention provides a product which is particularly useful for a pregnant woman. When a woman is expecting, she soon notices that she needs as much support for her growing tummy as for her aching back. The inner contours of the pillow of the present invention are designed to follow the natural curves and shapes of the body of the pregnant woman. No matter how she likes to sleep, the unique design of the present pillow eliminated the need for the woman to constantly change her position during the night. One will simply turn from side to side and the body pillow is a comfort fit for each position. The pillow provides equal support for back and tummy at the same time. One convex bulge is desired to fit into the curvature of the back while the other bulge is designed to fit into the curvature of the tummy.

Turning now to the further consideration of FIG. 3, if the toes 18 and 20 are pulled more towards each other so that a greater degree of overlapping occurs as compared to what is shown in FIG. 3, the toe sections can be pulled to the extent that the bulges 22 and 24 actually touch each other. In this condition an individual lying on the pillow would get full back support by the contiguous bulges 22 and 24. The abutting bulges would prevent rolling from side to side and would provide a "body contoured fit" back support along both sides of the spinal column.

What is claimed is:

1. A symmetrically contoured support pillow formed essentially in an inverted U-shape, comprising essentially a semi-circular crown and a pair of spaced symmetrical legs extending downwardly and outwardly divergently away from the crown, the legs having lower ends which are curved inwardly towards each other and forming toes, each leg having a convex bulge extending inwardly in the space

5

6

between the two legs, the bulges extending towards each other, the resulting space between the legs as formed by the convex bulges being essentially in the shape of an hourglass.

2. A symmetrically contoured support pillow as set forth in claim 1 wherein the crown is designed to support the head of a woman who is lying between the legs of the pillow on her side such that one of the bulges is received in a curvature of the back of the woman whereas the other bulge is received in a tummy area of the woman.

3. A symmetrically contoured support pillow as set forth in claim 1 wherein the toes are moved towards each other to create an overlapping condition, wherein the head of the woman is adapted to rest on the overlapping toes while one bulge is received in the curvature of the back of the woman and the other bulge is received in the tummy area of the woman.

* * * * *

**EXHIBIT C**

