IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BABYAGE.COM, INC., | ) | |
| | ) | |
|     Plaintiff-Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LEACHCO, INC., | ) | |
| | ) | |
|     Defendant-Counterclaim Plaintiff/ | ) | |
|     Third Party Plaintiff, | ) | No. 3:07-cv-01600-ARC |
| | ) | |
| and | ) | (Judge A. Richard Caputo) |
| | ) | |
| JAMIE S. LEACH, | ) | (electronically filed) |
| | ) | |
|     Counterclaim Plaintiff/ | ) | |
|     Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN M. KIEFER, JR., | ) | |
| | ) | |
|     Third Party Defendant. | ) | |

## BRIEF IN SUPPORT OF MOTION TO DISMISS
## BY DEFENDANT LEACHCO, INC.

Gary Peterson
OK 7068
211 N. Robinson Ave., Suite 450 South
Oklahoma City, OK 73102
telephone:   (405) 606-3367
fax:        (866) 628-0506
email:      gp@garypeterson.com

Sean V. Kemether
PA 70816
Kelly Grimes Pietrangelo & Vakil, P.C.
P.O. Box 1048
Media, PA 19063-0848
telephone:  610-565-2669
fax:       610-565-0780
email:     skemether@kgpv.com

Attorneys for Defendant Leachco

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    The Sherman Act Section 1 Claim Should Be Dismissed . . . . . . . . . . . . . . . 1

    A.    The Supreme Court's *Twombly* and *Leegin* Decisions Govern the Sufficiency of the Amended Complaint . . . . . . . . . . . . . . . . . . . . . 1

    B.    The Complaint Alleges No Plausible Injury to Interbrand Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    The Amended Complaint Offers No Plausible Allegations of a Conspiracy Between BRU and Leachco . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    The Amended Complaint Offers No Plausible Allegations of a Relevant Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.    Babyage Has Not Defined a Plausible Relevant Market for Retail Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.    Babyage Has Not Defined a Plausible Relevant Market for Manufacturing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    E.    The Amended Complaint Offers No Plausible Allegations of Market Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.    Babyage's Allegations of BRU Market Power in the Retail Sales Market Are Not Plausible . . . . . . . . . . . . . . . . . . 22

        2.    Babyage's Allegations of Leachco Market Power in the Manufacturing Market Are Not Plausible . . . . . . . . . . . . . . . . 25

II.    The Sherman Act Section 2 Claim Should Be Dismissed . . . . . . . . . . . . . . 28

i

# TABLE OF AUTHORITIES

*Cases*                                                                                    *Page*

*42nd Parallel N. v. E St. Denim Co.,*
286 F.3d 401 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23

*Bell Atlantic Corp. v. Twombly,*
550 U.S. ____, 127 S.Ct. 1955 (2007) . . . . . . . . 1, 2, 4-7, 10-12, 14, 19, 23-25, 27, 28

*Blue Cross & Blue Shield United v. Marshfield Clinic,*
65 F.3d 1406 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,*
769 F.2d 919 (2nd Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Business Electronics Corp. v. Sharp Electronic Corp.,*
485 U.S. 717 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Car Carriers, Inc. v. Ford Motor Co.,*
745 F.2d 1101 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*CCBN.com, Inc. v. Thomson Financial, Inc.,*
270 F. Supp.2d 146 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Coastal Transfer Co. v. Toyota Motor Sales,*
833 F.2d 208 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cupp v. Alberto-Culver USA, Inc.,*
310 F. Supp.2d 963 (W.D. Tenn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

*Davis-Watkins Co. v. Service Merchandise,*
686 F.2d 1190 (6th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dickson v. Microsoft Corp.,*
309 F.3d 193 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

*Dr. Miles Medical Co. v. John D. Park & Sons Co.,*
220 U. S. 373 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
504 U.S. 451 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TABLE OF AUTHORITIES (cont'd)

*Cases*                                                                         *Page*

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,*
637 F.2d 105 (3rd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Euromodas, Inc. v. Zanella, Ltd.,*
368 F.3d 11 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Fortner Enterprises, Inc. v. United States Steel Corp.,*
394 U.S. 495 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*FTC v. Whole Foods Market, Inc.,*
502 F. Supp.2d 1 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16, 26

*Garment District, Inc. v. Belk Stores Services, Inc.,*
799 F.2d 905 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hand v. Central Transport, Inc.,*
779 F.2d 8 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Harrison Aire, Inc. v. Aerostar International, Inc.,*
423 F.3d 374 (3rd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 27

*In re Super Premium Ice Cream Distributors Antitrust Litigation,*
691 F. Supp. 1262 (N.D. Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.,*
864 F.2d 1409 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*JES Properties, Inc. v. USA Equestrian, Inc.,*
253 F. Supp.2d 1273 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*KMB Warehouse Distributors, Inc. v. Walker Manufacturing Co.,*
61 F.3d 123 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
551 U.S. ____, 127 S. Ct. 2705 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-5, 7, 10

*Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n,*
855 F. Supp. 108 (E.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cases*                                                                 *Page*

*Menasha Corp. v. News America Marketing In-Store, Inc.*,
354 F.3d 661 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Monsanto Co. v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10, 12

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Industries, Inc.*,
889 F.2d 524 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20

*Philadelphia Fast Foods, Inc. v. Popeyes Famous Fried Chicken, Inc.*,
647 F. Supp. 216 (E.D. Pa. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
776 F.2d 185 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Queen City Pizza v. Domino's Pizza, Inc.*,
124 F.3d 430 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 19

*Queen City Pizza v. Domino's Pizza*,
922 F. Supp. 1055 (E.D. Pa. 1996), *aff'd*,
124 F.3d 430 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*,
637 F.2d 1001 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sheet Metal Duct, Inc. v. Lindab, Inc.*,
No. 99-6299 (E.D. Pa. July 18, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*SmithKline Corp. v. Eli Lilly & Co.*,
575 F.2d 1056 (3rd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*,
No. 05-519 (S.D. Ohio July 25, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
959 F.2d 468 (3rd Cir. 1992) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*TV Communications Network, Inc. v. Turner Network Television, Inc.*,
964 F.2d 1022 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

### Statutes

United States Code

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21, 25, 28

15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28, 29

### Other Authorities

IIB Phillip E. Areeda & Herbert Hovenkamp,
*Antitrust Law* ¶ 501 (3rd ed. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

William M. Landes & Richard A. Posner,
*Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937 (1981) . . . . . . . . . . . . 21, 27

Leachco is a manufacturer of baby and juvenile products, while Babyage is retailer of these types of products. In Count II of its amended complaint, Babyage alleges that Leachco has violated the antitrust laws because of Leachco's resale price maintenance ("RPM") policy. According to Babyage, Leachco's RPM policy was the result of a conspiracy between Leachco and one of Babyage's retail competitors, Babies "R" Us, Inc. ("BRU").[1] We are moving to dismiss Count II, for failure to state a claim.

## I.      The Sherman Act Section 1 Claim Should Be Dismissed.

Paragraphs 72-78 of the amended complaint allege a conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This claim should be dismissed.

## A.      The Supreme Court's *Twombly* and *Leegin* Decisions Govern the Sufficiency of the Amended Complaint.

The Supreme Court recently clarified the standards for pleading of an antitrust conspiracy in *Bell Atlantic Corp. v. Twombly*, 550 U.S. ____, 127 S.Ct. 1955 (2007). In affirming the dismissal of the plaintiff's complaint, the Court ruled that while a pleading need not set out "detailed factual allegations," it must contain "more than labels and conclusions ... [A] formulaic recitation of the elements of a cause of action will not do .... Factual allegations must be enough to raise a right to relief above the speculative level ...." 127 S.Ct. at 1964-65. According to the *Twombly* Court, a pleading must set out "enough facts to state a claim to relief that is plausible on its face." 127

---

[1]BRU is not a party in this action. It is, however, defendant in a virtually identical antitrust action filed by Babyage in 2005. See *Babyage.com, Inc. et al. v. Toys "R" Us, Inc., d/b/a/ Babies "R" Us et al.*, No. 2:05-cv-6792-AB (E.D. Pa.). In 2007, the trial judge in that action granted the defendants' motion for judgment on the pleadings, while authorizing Babyage to file a third amended complaint (Doc. 290). Motions to dismiss that amended pleading are currently pending.

S.Ct. at 1974. Under *Twombly*, conclusory allegations of a conspiracy, or of any other element of an antitrust cause of action, are insufficient to state a claim.

On the heels of *Twombly*, the Supreme Court issued its landmark decision in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. ____, 127 S. Ct. 2705 (2007), and revolutionized the law governing vertical resale price maintenance ("RPM") agreements. In *Leegin*, the Supreme Court acknowledged that manufacturers have legitimate and procompetitive business justifications for RPM agreements, and overruled *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U. S. 373 (1911), the almost-century old antitrust precedent holding such agreements *per se* unlawful. Under *Leegin*, a plaintiff challenging an RPM agreement must now plead and prove harm to **interbrand** competition -- *i.e.*, the wider market that includes rival manufacturers of competing products.

The Babyage antitrust claim cannot survive scrutiny under the standards of *Twombly* and *Leegin*: it offers no plausible allegations of a conspiracy, fails to allege any plausible harm to interbrand competition, and fails to allege either a plausible relevant market or power in such a market.

**B.     The Complaint Alleges No Plausible Injury to Interbrand Competition.**

The *Leegin* Court noted that "economics literature is replete with pro-competitive justifications for a manufacturer's use of resale price maintenance." 127 S.Ct. at 2714. The Court, for example, pointed to the fact that RPM agreements may encourage retailers to invest in providing additional services, by offering the retailer a "guaranteed" margin. 127 S.Ct. at 2716. Similarly, the Court explained that RPM agreements may give consumers more options, allowing them to "choose among low-

price, low-service brands; high-price, high-service brands; and brands that fall in between." 127 S.Ct. at 2715. In addition, the Court observed that RPM agreements can help minimize the risk of "free-riding," situations in which discounting retailers "capture some of the increased demand" generated by retailers who invest in increased services, thereby reducing the incentive to provide such services. 127 S.Ct. at 2715-16. Given the overwhelming consensus that RPM agreements can have legitimate, procompetitive effects, the Supreme Court overruled *Dr. Miles* and held that vertical RPM agreements are no longer *per se* unlawful, but instead must be analyzed under the rule of reason. 127 S.Ct. at 2725.

The *Leegin* Court acknowledged that RPM agreements can, in certain circumstances, be used to achieve anticompetitive effects, but emphasized that antitrust concerns are typically limited to certain, specific types of effects impacting **interbrand** competition. The Court explained that **intrabrand** effects -- that is, "competition among retailers selling the same brand"[2] -- are generally not enough to establish an antitrust violation under the rule of reason. 127 S.Ct. at 2718 ("the antitrust laws are designed primarily to protect **interbrand** competition" as opposed to **intrabrand** competition) (emphasis added). On that basis, the Court in *Leegin* expressly rejected the plaintiff's argument that RPM agreements ought to be unlawful because they can lead to higher prices for a manufacturer's goods, stating

---

[2]127 S.Ct. at 2715.

that "[plaintiff] is mistaken in relying on pricing effects absent a further showing of anticompetitive conduct." 127 S.Ct. at 2718.[3]

Here, Babyage's amended complaint rests on two supposed "injuries," neither of which would establish harm to interbrand competition. First, it claims that the alleged agreement between BRU and Leachco led to higher prices for Leachco's products. See Doc. 42, ¶ 69 ("The Agreements have made prices for products sold in the relevant market(s) supracompetitive"). But, as explained above, the Supreme Court in *Leegin* expressly held that an allegation of "supracompetitive" pricing does not supply a basis to infer injury to interbrand competition. 127 S. Ct. at 2718. Consequently, because Babyage has simply declared that the alleged conspiracy has "made prices for products sold in the relevant market(s) supracompetitive," it has failed to state a claim.

Second, Babyage claims that "[b]ut for the Agreements, competition would increase, and prices for products sold in the relevant market(s) would fall substantially." See Doc. 42, ¶ 69. This bare allegation does not even acknowledge the existence of competing juvenile and baby product brands, let alone include any facts from which one could conclude that there was injury to interbrand competition, or how competition would increase. The allegation is insufficient under *Twombly*.

---

[3]See also *42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 405-06 (7th Cir. 2002) ("Just because a retailer raises prices doesn't mean competition has been harmed."); *KMB Warehouse Distributors, Inc. v. Walker Manufacturing Co.*, 61 F.3d 123, 127 (2nd Cir. 1995) ("To prevail on a section 1 claim, a plaintiff must also show more than just an adverse effect on competition among different sellers of the same product ('intrabrand' competition)").

Moreover, according to Babyage, the purported elimination of competition was brought about through separate RPM agreements between Leachco and its retailers. See Doc. 42, ¶¶ 18, 48. But Leachco's alleged RPM agreements related only to the retail price of **Leachco's** products, not those of its competitors. See Doc. 42, ¶ 48 ("dictating the resale prices ... other Retailer customers of Leachco had to charge for Leachco products"). So, this is merely an allegation of injury to **intra**brand competition (between different retailers of Leachco products), and *Leegin* once again establishes that such an allegation does not state a claim. 127 S. Ct. at 2715 (confirming that "minimum resale price maintenance can stimulate interbrand competition -- the competition among manufacturers selling different brands of the same type of product -- by reducing intrabrand competition -- the competition among retailers selling the same brand").

Indeed, to the extent that Babyage is claiming that, absent Leachco's RPM policy, some retailers might have lowered their prices, *Leegin* recognized that that is an effect of **every** RPM policy, and is simply the type of **intra**brand effect that the Court confirmed was typically pro-competitive. To put this in the language of *Twombly*, alleging only **intra**brand effects keeps the allegations "in neutral territory," and "stops short of the line between possibility and plausibility of entitlement to relief." 127 S.Ct. at 1966.

Because Count II offers no **facts** from which one could plausibly infer that the alleged conspiracy injured interbrand competition, it fails to state a claim.

**C.    The Amended Complaint Offers No Plausible Allegations of a Conspiracy Between BRU and Leachco.**

While Babyage alleges that Leachco and BRU engaged in an unlawful conspiracy, its amended complaint furnishes virtually no facts about the nature of the alleged conspiratorial agreement. What natural persons formed the agreement? When did the meeting of minds occur? How and where was the agreement entered into? Was it written or oral? During what time period was the agreement effective? The amended complaint answers none of these questions. Moreover, the few facts that Babyage does allege are wholly consistent with lawful unilateral action by Leachco. As such, the amended complaint is legally insufficient under *Twombly*.

The conspiracy-related allegations in the amended complaint fall into five basic categories:

- BRU was an important retail account for Leachco. Doc. 42, ¶¶ 32, 36, 67, 68.

- BRU urged Leachco to adopt an RPM policy. Doc. 42, ¶¶ 33, 35, 37, 48, 52, 56.

- Leachco adopted a RPM policy and sought to enforce it against Babyage and other retailers. Doc. 42, ¶¶ 38-47, 57, 62.

- Leachco and BRU engaged in surveillance of retail prices being charged for Leachco products. Doc. 42, ¶ 49.

- Conclusory allegations of a conspiracy between BRU and Leachco that lack any "who, what, where, or when" specificity. Doc. 42, ¶¶ 18, 20-24, 48, 51-54, 59-60, 64, 73, 80.

As explained below, none of these allegations, either alone or in combination, would demonstrate a conspiracy that would violate the Sherman Act and meet the requirements of *Twombly*. Babyage has alleged nothing more that ordinary business communications that are both lawful and consistent with unilateral conduct by Leachco.

An antitrust conspiracy is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984). Babyage must allege, and ultimately prove, facts that "tend ... to exclude the possibility of independent action." *Id.* Moreover, "antitrust law limits the range of permissible inferences from ambiguous evidence in a section 1 case." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Babyage therefore must provide "allegations plausibly suggesting (not merely consistent with)" an antitrust violation. *Twombly*, 127 S.Ct. at 1966. And given that the Supreme Count in *Leegin* recognized that businesses have legitimate reasons for adopting RPM policies, simply pleading the existence of an RPM policy does nothing to support a conspiracy allegation: there is "no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Twombly*, 127 S.Ct. at 1971.

Babyage's first type of allegation, that BRU was an important retail account for Leachco, is inconsequential. There is nothing anticompetitive about treating major customers well, and evidence that Leachco treated BRU as an important customer is not evidence "that tends to exclude the possibility of independent action." *Monsanto*, 465 U.S. at 768.

Babyage's second type of allegation, that BRU urged Leachco to adopt an RPM policy, likewise fails to allege a conspiracy, as a matter of law. The Supreme Court and the circuit courts have recognized that manufacturers have "legitimate reasons" to seek input from their retailers about various strategic decisions (including pricing), and to act upon that input. *Monsanto*, 465 U.S. at 762. For that reason, the Supreme Court has held that a conspiracy cannot be inferred from such facts. *Id*. at 763-64. Since "distributors are an important source of information for manufacturers," the *Monsanto* Court warned that prohibiting manufacturers from consulting with distributors, and taking action "in response to" information from them, "would create an irrational dislocation in the market." *Id*. at 763-64.

According to Babyage, BRU employed coercion and a threat of termination to induce Leachco to adopt its RPM policy. See, *e.g.*, Doc. 42, ¶¶ 18, 33, 37. But these facts, even if true, are not sufficient to establish a conspiracy. For example, *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 13-14 (1st Cir. 2004), involved an allegation that a dominant retailer of men's clothing "used its market power to force [a manufacturer] into a minimum resale price maintenance scheme." The plaintiff, a competing discount retailer, sued both the dominant retailer and the manufacturer, claiming that the "scheme was in part intended to -- and did -- restrict its access to [the manufacturer's] pants." *Id*. at 14. The plaintiff pointed to evidence that the dominant retailer had complained about discounters, and that its executives repeatedly told the manufacturer they would stop carrying its clothing unless it satisfactorily addressed their concerns about being undersold by the plaintiff. The First Circuit affirmed summary judgment for the defendants.

The *Euromodas* Court held that "the raw fact that a distributor's actions are an attempt to pressure a manufacturer into terminating a distribution relationship with a price-cutting competitor is not enough either to show concerted action or to defeat summary judgment." *Id.* at 19. The Court confirmed that evidence that the manufacturer acted "in response to complaints" from a major dealer is insufficient to survive a motion for summary judgment. *Id.* "[E]ven were we to assume for argument's sake that [the manufacturer's] termination of its distribution relationship with the plaintiff was in direct response to [the dominant retailer's] withdrawal of its patronage, summary judgment would nonetheless be warranted." *Id.* at 20. The same conclusion is warranted here.

Likewise, in *Garment District, Inc. v. Belk Stores Services, Inc.*, 799 F.2d 905 (4th Cir. 1986), the Fourth Circuit affirmed a directed verdict for the defendant on the ground that evidence that a retailer complained to a manufacturer and urged it to terminate a competing retailer, coupled with evidence that the manufacturer acted on those complaints, was not evidence from which a court could infer an illegal agreement. 799 F.2d at 908-09. Notably, Garment District expressly argued that Belk's dominance as a retailer was meaningful, but the Court held that "this distinction does not alter our analysis." *Id.* at 909. The Fourth Circuit recognized that "*Monsanto* emphasizes that a manufacturer may have legitimate, independent reasons for terminating a discounter in response to dealer complaints." *Id.* at 910.[4]

_____

[4]See also *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 922 (2nd Cir. 1985) (insufficient evidence of agreement where large retailer announced it would not purchase clothes from manufacturers who sold to "off-price" retailers, and manufacturers complied).

Under these authorities, Babyage's allegations are insufficient to establish a conspiracy.

Babyage's third category of allegation, that Leachco adopted and sought to enforce an RPM policy against Babyage and other retailers, are wholly consistent with lawful unilateral action by Leachco. *Leegin* has now recognized that manufacturers routinely have RPM policies as part of their ordinary business activities, and that implementation of such policies is consistent with unilateral conduct. See *Leegin*, 127 S.Ct. at 2714-16. Under *Twombly*, Babyage does not satisfy its burden of sufficiently alleging a conspiracy simply by pointing to the existence of an RPM policy, or pointing to such a policy's natural and expected effects.

Babyage's fourth category of allegation, that BRU and Leachco engaged in "extensive retail price surveillance," Doc 42, ¶ 49, likewise fails to suggest conspiracy. BRU and Leachco had obvious independent incentives to monitor retail prices of Leachco products. In order to meet its retail competition, BRU would have needed to monitor the prices of that competition. Leachco would have had its own motive to monitor retail prices of its products, so as to "ensure that its distributors earn sufficient profit." See *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 762-63 (1984). Retail price surveillance in no way suggests a conspiracy between Leachco and BRU.

The fifth and final category of Babyage allegation is nothing more that a series of bald declarations that Leachco conspired with BRU. Perhaps hoping that repetition will adequately cure the lack of specificity, Babyage repeatedly makes bare assertions of conspiracy. But leaving aside the rhetoric, Babyage has not alleged

**facts** showing any such conspiracy, and *Twombly* confirms that a plaintiff cannot simply declare that alleged conduct was the result of a conspiracy. 127 S.Ct. at 1970. Just as in *Twombly*, the Babyage amended complaint "mention[s] no specific time, place, or person involved in the alleged conspiracies." *Id*. n.10. Babyage thus has not pled sufficient **facts,** that, if true, would demonstrate any conspiracy with BRU.

Moreover, Babyage's theory of conspiracy is inherently implausible. Babyage is alleging (1) that BRU, in order to "preserve and enhance [its] market dominance and monopoly power" (Doc. 42, ¶ 23), coerced Leacho into establishing and enforcing price policies in violation of Sherman Act Section 1, and (2) that Leachco conspired with BRU to help BRU attain and maintain monopoly power in violation of Section 2. But as courts have repeatedly recognized, a manufacturer would have no rational motive to help one of its retailers to become a monopolist. Likewise, a distributor would have no rational reason for helping one its suppliers become a monopolist. Courts thus have repeatedly held that an allegation of a vertical conspiracy in which a manufacturer is ostensibly helping a distributor gain monopoly power, or a retailer is helping a manufacturer gain monopoly power, is so economically irrational that it simply does not state a cognizable claim. See *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir. 1992) (affirming dismissal of claim that distributor conspired with supplier to aid supplier in its efforts to acquire or maintain monopoly because it is "implausible" and distributor "would have no rational motive to create such an environment"); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 n.5 (5th Cir. 1981) ("Given the divergent interests between a manufacturer and its distributors, . . . it

is unlikely that a manufacturer not controlled by its distributors . . . would be a party to a distributor-created, and hence distributor-serving, conspiracy."); *Coastal Transfer Co. v. Toyota Motor Sales*, 833 F.2d 208, 211 (9th Cir. 1987) ("such an intention . . . would have been illogical because a restriction on competition in the [given] market would have raised prices in a market in which [the defendant] purchased services"); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109-10 (7th Cir. 1984) ("plaintiffs are alleging, in essence, that [defendant] conspired to injure itself."). The conspiracy alleged by Babyage is equally implausible.

In the end, the most Babyage can muster are allegations of communications between BRU and Leachco regarding pricing. But that is precisely the type of ordinary business communication that *Monsanto* and its progeny protect, and indeed, encourage. Under *Twombly*, such allegations fail because they are subject to an "obvious alternative [non-conspiratorial] explanation," and do not constitute "plausible grounds to infer an agreement." In the words of the *Twombly* Court, Babyage's allegations of conspiracy "stop ... short of the line between possibility and plausibility of entitlement to relief." 127 S.Ct. at 1966, 1972 (quotation omitted). Count II accordingly fails to state a claim.

**D.    The Amended Complaint Offers No Plausible Allegations of a Relevant Market.**

An antitrust plaintiff bears the burden of defining the relevant market in its complaint. Without adequate allegations of a relevant market, an antitrust claim is subject to dismissal. See *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 436

(3rd Cir. 1997). Babyage has failed to offer a legally sufficient market definition in its amended complaint here.

As the Third Circuit has explained, "defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability -- actual or potential -- to take significant amounts of business away from each other." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3rd Cir. 1978). Products are in the same market if they are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "Reasonable interchangeability of use in effect means 'substitutability' -- the practical ability of a consumer to switch from one product to another." *FTC v. Whole Foods Market, Inc.*, 502 F. Supp.2d 1, 16 (D.D.C. 2007).

If a plaintiff fails to define **in its complaint** its proposed relevant market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436.

In *Queen City Pizza*, the plaintiff alleged a market comprising certain pizza ingredients and supplies meeting Domino's standards. The Third Circuit affirmed dismissal of plaintiff's antitrust claim on the ground that the proposed market improperly excluded similar ingredients from other suppliers. 124 F.3d at 437-39. The Court held that, even though Domino's franchisees were limited to using only

Domino's-approved products, "[t]he test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but commodities reasonably interchangeable by consumers for the same purposes." *Id.* (quotation omitted).[5]

1. **Babyage Has Not Defined a Plausible Relevant Market for Retail Sales.**

In Count II, Babyage alleges several alternative relevant retail markets. Its first alternative is "retail sales of high-end baby and juvenile carriers, restraints, pregnancy pillows, bedding, and nursing pillows." Doc. 42, ¶ 65. Therefore, there are three elements to Babyage's proposed market definition: (1) "retail sales" (2) of "high-end" (3) "baby and juvenile carriers, restraints, pregnancy pillows, bedding, and nursing pillows." Babyage has not pleaded any of these elements consistently with *Twombly*.

First, Babyage has alleged its market in terms of "retail sales." On its face, the use of "retail sales" would appear to encompass **all** sales made to consumers. Yet, while Babyage implicitly acknowledges that there are many retailers in this alleged market, see Doc. 42, ¶ 18, Count II does not identify any of them (aside from BRU, an alleged conspirator). Babyage's failure to allege the boundaries of the "retail sales" market and account for the firms that are in it is alone sufficient to dismiss Count II. See *Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*, No. 05-519, slip opinion at 13-14 (S.D. Ohio July 25, 2007) (granting motion to dismiss because plaintiffs' complaint did not discuss other insurance companies or agents

---

[5]See also *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (affirming dismissal for failure to plead a plausible relevant market).

aside from the named defendants; copy attached as Exhibit 1); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp.2d 963, 971 (W.D. Tenn. 2004) (plaintiffs' allegations must include a "specific definition and accounting of the brands and suppliers to be included in the relevant market").

Second, Babyage does not allege the boundaries of "high-end." Babyage is alleging that some portion of the retail sales of some products constitutes a separate market, but it does not tell Leachco or the Court what portion it is. Babyage does not allege what the price limits are, which manufacturers do and do not make high-end products, and which retailers do and do not sell them. None of the Babyage allegations speaks to the question of whether a "high-end" baby product is or is not reasonably interchangeable with other baby products. Babyage does not state a claim when all it will say is that some fraction of the retail sales of baby and juvenile products is relevant to the case, but will not reveal what fraction it is.

Indeed, courts have repeatedly rejected market definitions purporting to carve out a "high-end" portion of the market when there is a spectrum of price and quality differences. These cases explain that the relevant inquiry is "reasonable substitutability," and a "high-end" is reasonably substitutable for other market segments. See, *e.g., Murrow Furniture Galleries, Inc. v. Thomasville Furniture Industries, Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (no separate market for high-end furniture); *Whole Foods*, 502 F. Supp.2d at 34-36 (no separate market for retail sales of premium natural and organic groceries); *JES Properties, Inc. v. USA Equestrian, Inc.*, 253 F. Supp.2d 1273 (M.D. Fla. 2003) (rejecting market limited to "A" rated horse shows because plaintiffs provided no factual allegations supporting such a

limitation); *In re Super Premium Ice Cream Distributors Antitrust Litigation*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (no market for super premium ice cream, because any characteristics distinguishing super premium ice cream from other ice cream "are economically meaningless where the differences are actually a *spectrum* of price and quality differences" (emphasis in original).

In this case, for example, Babyage has not alleged any facts whatsoever articulating whether (and why, or why not) the retail sale of a Leachco carrier is or is not part of the same market as the retail sale of an Infantino carrier, or an Evenflo carrier. Since the relevant question is "reasonable substitutability," or "the practical ability of a consumer to switch from one product to another," *Whole Foods*, 502 F. Supp.2d at 16, Babyage's definition concerning "high-end" is therefore insufficient as a matter of law.

Third, Babyage has offered absolutely no explanation for why it has arbitrarily limited its proposed market to the retail sales of **only** those baby and juvenile products manufactured by Leachco. Babyage does not and cannot explain why the retail sale of other baby and juvenile products -- such as cribs, bassinets, baby gates, clothing, toys, play yards, changing tables, diapers, etc. -- are not included in the market.

By way of comparison, an antitrust plaintiff might allege a relevant market consisting of the retail sales of groceries. But it is facially implausible to allege a market that includes only the retail sales of asparagus, cheese, and chicken, but not the retail sales of tomatoes, milk, and beef. Grocery consumers buy their groceries at retail stores that carry all types of groceries: speciality stores that carry only

asparagus, cheese and chicken do not exist. Babyage's market definition is equally implausible. It has gerrymandered a market that includes the non-substitutable products of Leachco, and excludes both the equally non-substitutable and the clearly substitutable products of other manufacturers. And Babyage has alleged no facts that would justify such inclusions and exclusions. See *Sheet Metal Duct, Inc. v. Lindab, Inc.*, No. 99-6299, slip opinion at 9, n.6 (E.D. Pa. July 18, 2000) ("the alleged product market must be plausible, and courts may reject proposed relevant market allegations that make no economic or theoretical sense"; copy attached as Exhibit 2).

It is thus not surprising that Babyage has not identified **a single retailer** that engages in sales coextensive with its own market definition. The amended complaint makes it clear that it cannot. The complaint identifies Babyage as a "baby and juvenile product retailer" -- **not** limiting its market activities to "high-end" products or the products of Leachco. See Doc. 42, ¶ 18. Babyage thus admits that it does not compete in a market that matches the alleged relevant market.

Likewise, the amended complaint identifies BRU as a "multibrand retailer" that sells a litany of baby and juvenile products not manufactured by Leachco, and not limited to "high-end" merchandise. Indeed, Babyage concedes that BRU sells a wide range of products, including "cribs, dressers, changing tables; bedding and related accessories; baby gear, such as play yards, booster seats, high chairs, strollers, and car seats; baby carriers and restraints, toddler and infant plush toys; gifts; clothing; infant feeding supplies; health and beauty aids; pregnancy and nursing pillows, and infant care products." Doc. 42, ¶¶ 25-26. In other words, BRU

(Babyage's retail competitor) likewise does not compete in a market that matches the alleged relevant market.

It is clear from the amended complaint that both of the identified retailers -- BRU and BabyAge -- (1) sell more types of baby and juvenile products than the few categories that Babyage has selected for its alleged relevant market; (2) sell products at quality and price levels along spectrums that presumably span far below and above Babyage's undisclosed boundaries for "high-end"; and (3) even within the categories of products manufactured by Leachco, they sell products manufactured by many other suppliers. Babyage's own market activities are squarely contrary to its alleged market definition. That definition is not based on any actual market realities, and is instead fictionally tailored to Leachco.

Babyage's alternative alleged relevant market consists of five **separate** markets: retail sales of high-end pregnancy pillows; retail sales of high-end nursing pillows; retail sales of high-end bedding; retail sales of high-end infant carriers; and retail sales of high-end infant restraints. Doc. 42, ¶ 65. The flaws in such a market definition are similar to those outlined above, For example, Babyage does not define "high-end," and does not explain why "high-end" products are not reasonably substitutable for other products.

To the extent that Babyage is claiming that there could be a market limited to retail sales of a single manufacturer's products -- *i.e.*, Leachco's -- that allegation is implausible. Courts have repeatedly rejected efforts to limit the market to a single defendant's products, especially when, as here, Babyage does not (and cannot in good faith) allege that there are no substitutes for Leachco's products. See, *e.g.*, *Town*

*Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3rd Cir. 1992) (en banc) (allegation of market limited to single brand of cars "makes no sense in terms of real world economics, and as a matter of law we cannot adopt it"); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 723-26 (3rd Cir. 1991) (refusing to limit market to Ford tractors); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117-18 (3rd Cir. 1980) (product market not restricted to Texaco gasoline).

Babyage's alleged retail market definitions lack supporting facts, do not adequately put Leachco on notice, and are inherently implausible. Under *Twombly*, such "bare assertions" "stop ... short of the line between possibility and plausibility." 127 S.Ct. at 1966. Count II accordingly fails to state a claim for failure to define a legally sufficient relevant market for retail sales.

## 2. Babyage Has Not Defined a Plausible Relevant Market for Manufacturing.

Leachco is a manufacturer of baby and juvenile products, and thus does not compete in any retail market. However, Babyage has alleged that Leachco is a dominant manufacturer of high-end pregnancy pillows, and a non-dominant manufacturer of high-end nursing pillows, bedding, baby carriers and restraints. Doc. 42, ¶ 19. Elsewhere, Babyage claims that Leachco possessed substantial market power "in the market(s) for its respective products ..." Doc. 42, ¶ 68. Such a definition of a relevant manufacturing market is wholly insufficient, because it fails to define the market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand." See *Queen City Pizza*, 124 F.3d at 436.

Even if the amended complaint provided some definition of "high-end," it offers no facts showing why "high-end" baby and juvenile products are not reasonably interchangeable with non-"high-end" products. As noted above, courts have repeatedly rejected efforts to carve out "high-end" relevant markets. See, *e.g.*, *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Industries, Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (no separate market for high-end furniture). Moreover, Count II wholly fails to allege boundaries of any manufacturing market and account for the firms that are or are not in it. See *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (plaintiffs' allegations must include a "specific definition and accounting of the brands and suppliers to be included in the relevant market"). Count II accordingly fails to state a claim.

## E. The Amended Complaint Offers No Plausible Allegations of Market Power.

In its amended complaint, Babyage has alleged two forms of market power. With regard to Leachco, Babyage claims that Leachco has market power as a manufacturer of certain "high-end" baby and juvenile products. With regard to BRU, Leachco's alleged conspirator, Babyage claims that BRU had market power in the market for retail sales of the same "high-end" products. Neither allegation is plausible.

"The first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries (lower output and the associated welfare losses) that matter under the federal antitrust laws." *Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004);

see also *Queen City Pizza v. Domino's Pizza*, 922 F. Supp. 1055, 1060 (E.D. Pa. 1996), *aff'd*, 124 F.3d 430, 435 (3rd Cir. 1997) ("in order to state a Sherman Act claim under either § 1 or § 2, a plaintiff must identify the relevant product and geographic markets and allege that the defendant exercises market power within those markets"). A complaint fails to state a claim without an allegation of market power. See *Hand v. Central Transport, Inc.*, 779 F.2d 8, 11 (6th Cir. 1985).

"Market power is the ability to raise price by restricting output." IIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 501, at 109 (3rd ed. 2007); *see also* William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937 (1981) (defining market power as "the ability of a firm . . . to raise price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded"). Areeda and Hovenkamp note that "the substantial market power that concerns antitrust law arises when the defendant (1) can profitably set prices well above its costs and (2) enjoys some protection against a rival's entry or expansion." IIB Areeda & Hovenkamp ¶ 501, at 110. "Unless the firms have the power to raise price by curtailing output, their agreement is unlikely to harm consumers, and it makes sense to understand their cooperation as benign or beneficial." *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 191 (7th Cir. 1985); see also *Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1202 (6th Cir. 1982) ("without market power, a firm cannot have an adverse effect on competition").

1.   **Babyage's Allegations of BRU Market Power in the Retail Sales Market Are Not Plausible.**

As discussed above, Babyage has offered no legally sufficient definition of a relevant market for retail sales. But even if it had done so, its amended complaint would still be subject to dismissal, for failing to offer any plausible allegation of BRU market power within that relevant market.

The Supreme Court has noted that "retail market power is rare, because of the usual presence of interbrand competition and other dealers." *Business Electronics Corp. v. Sharp Electronic Corp.*, 485 U.S. 717, 727, n.2 (1988). One retailer is unlikely to be able to have market power because other actual or potential retailers can relatively easily offset any efforts by a single retailer to curtail output or raise prices. See, *e.g.*, *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415 (7th Cir. 1989).

In *Indiana Grocery*, the Seventh Circuit considered market power in the context of retail groceries, and recognized in the context of grocery retailers that "supermarkets do not primarily produce groceries; they usually obtain them from food wholesalers or producers. It thus seems highly likely that if Kroger or any other competitor in the Indianapolis market attempted to curtail the total amount of groceries sold to Indianapolis consumers, existing competitors or new entrants could relatively easily offset that action by importing more food from Kroger's or other suppliers." 864 F.2d at 1414. Similarly, the Ninth Circuit held that gasoline retailers lack market power because they "do not have to build more gas stations to satisfy customers' wants. They can simply purchase and transport more gasoline via the

pipeline." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1442 (9th Cir. 1995).

An individual retailer typically has no power to reduce output (or, consequently, to

raise prices) because of the presence of other actual or potential retailers. See *State

Oil Co. v. Khan*, 522 U.S. 3, 18 (1997) ("We do not intend to suggest that dealers

generally possess sufficient market power to exploit a monopoly situation. Such retail

market power may in fact be uncommon").

Babyage has not alleged any facts that even suggest that the alleged retail

market in this case is different from other retail markets in which courts have held

that there can be no market power. Babyage has alleged only a bare legal conclusion

that "[b]y virtue of its power to control prices and exclude competition in the relevant

market(s), BRU at all relevant times possessed monopoly power in the relevant

market(s)." Doc. 42, ¶ 67. But aside from invoking antitrust buzzwords, Babyage has

failed to allege any actual **facts** that would demonstrate that BRU has market power

in the purported relevant market. Babyage must allege, and ultimately prove, that

BRU in fact has the power to control prices and/or reduce output. With hundreds of

competitors, including Wal-Mart, K-Mart, Sears and Target, BRU has no such power,

and Babyage does not and cannot allege any facts to the contrary. See *42nd Parallel

North v. E. Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) ("In considering a

motion to dismiss, the court is not required to don blinders and to ignore common

reality."). Under *Business Electronics*, therefore, Babyage's bare allegation is

presumptively implausible and does not satisfy its burden under *Twombly*.

The only Babyage allegation even arguably relevant to whether BRU has

market power is that BRU considers itself to be the "largest specialty retailer" of

baby and juvenile products in the U.S., and the only one that operates on a national scale. Doc. 42, ¶ 25. But even if Babyage had alleged a market of "specialty retailers" (which it has not and cannot), courts have repeatedly recognized that size is not evidence of market power, and have held that alleging that a defendant is the "largest" firm does not state a claim: "Being the 'largest' in a relevant market . . . says nothing of a firm's ability to affect competition in that market." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 n.20 (4th Cir. 2002) ("Gravity did allege that Compaq and Dell were the 'largest PC makers' and were 'among the largest distributors of Microsoft's products.' . . . Gravity's allegations that Compaq and Dell were the largest PC makers and software distributors provide no basis whatsoever to conclude that either had sufficient share of the PC market to affect competition in the relevant software markets.").

Babyage states in passing that "BRU at all relevant times possessed monopoly power in the relevant market(s). Moreover, at all relevant times BRU possessed dominant shares of the market(s) for retail sales of high-end baby and juvenile carriers, restraints, pregnancy pillows, bedding, and nursing pillows, respectively, and was a critical outlet for Leachco." Doc. 42, ¶ 67. If Babyage is trying to rely on market share as a proxy for market power, *Twombly* teaches that a plaintiff cannot simply state its legal conclusion that BRU has high market share. The Third Circuit, for example, has held that "plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a relevant product market, of the alleged monopolist's dominant share of that market, and of high barriers to entry." See *Harrison Aire, Inc. v. Aerostar International, Inc.*, 423 F.3d 374, 381 (3rd

Cir. 2005); see also *CCBN.com, Inc. v. Thomson Financial, Inc.*, 270 F. Supp.2d 146, 155 (D. Mass. 2003) ("More must be alleged to satisfy the market power element of a § 1 claim than the mere assertion that such power exists.").

Moreover, Babyage's other allegations flatly contradict the notion that BRU has market power. Babyage alleges that it "wins sales ... by dropping its prices lower than those of competitors (such as BRU)." Doc. 42, ¶ 24. Babyage also alleges that if BRU does not lower its prices to the level of Babyage, BRU will lose sales to them. Doc. 24, ¶ 28. The amended complaint in fact specifically alleges that BRU feared discounting by competitors such as Babyage because such discounting created "competitive constraints on its ability to garner increased sales volume and inflated prices." Doc. 24, ¶ 30. In other words, according to Babyage, BRU cannot control price or restrict output (sales), and instead must either match the prices of internet retailers or lose business. These allegations effectively admit that BRU lacks market power. Babyage's allegations of BRU market power are implausible, and thus insufficient under *Twombly*.

2.     **Babyage's Allegations of Leachco Market Power in the Manufacturing Market Are Not Plausible.**

As discussed above, Babyage has offered no legally sufficient definition of a relevant market for manufacturing of certain "high-end" baby and juvenile products. But even if it had done so, its amended complaint would still be subject to dismissal, for failing to offer any plausible allegations that BRU has market power in such a manufacturing market.

According to Babyage, Leachco "possessed substantial market power in the market(s) for its respective products, due, in part, to the high level of product differentiation in the industry." Doc. 42, ¶ 68. But simply labeling products as "differentiated" does not supply any relevant facts regarding market power. *See Whole Foods*, 502 F. Supp. 2d at 70-71 ("Differentiation does not equate to a unique relevant product market for antitrust purposes."); see also *id*. at 99 ("The fact that supermarkets seek to differentiate themselves from one another by emphasizing certain products or services does not address the relevant question for product market definition").

Babyage further alleges that Leachco sold its products "at prices in excess of marginal costs," "enjoyed high profit margins," and sold "substantially in excess of the competitive price." Doc. 42, ¶ 68. Of course, Leachco can hardly be faulted for selling its products at prices in excess of cost: that is the only way that a manufacturer can make a profit. And simply declaring that prices for Leachco's products are high says nothing about its market position. See *Harrison Aire, Inc. v. Aerostar International, Inc.*, 423 F.3d 374, 381 (3rd Cir. 2005) ("Harrison Aire contends Aerostar charged supracompetitive prices for its fabric .... But this alone does not support a reasonable inference of monopoly power."); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) ("it is always treacherous to try to infer monopoly power from a high rate of return"). These allegations are insufficient to plausibly establish market power.

Babyage further alleges that Leachco "enjoyed substantial barriers to market entry and growth." Doc. 42, ¶ 68. However, the amended complaint does not contain

a single allegation that would suggest what might stop other firms from entering the market for pregnancy pillows, nursing pillows, bedding, carriers and/or restraints. Mere pleading of antitrust buzzwords, such as "barriers to entry," is not sufficient under *Twombly*. See 127 S.Ct. at 1964-65 ("labels and conclusions" insufficient to establish plausible right to relief). The amended complaint offers no facts establishing the existence of entry barriers.

Babyage further alleges that Leachco "would not, by raising prices ... a small but significant nontransitory amount, lose sufficient sales to make such a price increase unprofitable." Doc. 42, ¶ 68. This allegation offers nothing more than an economic definition of "market power," with no supporting facts of any kind. See William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937 (1981) (defining market power as "the ability of a firm . . . to raise price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded"). When unsupported by any factual allegations, such antitrust buzzwords are insufficient under *Twombly*.

Finally, the amended complaint alleges that Leachco is a "dominant" manufacturer of "high-end" pregnancy pillows, with a supposed 95% market share. Doc. 42, ¶ 68. No similar allegation of dominance or market share is made with regard to any of the other products identified as comprising the relevant market -- *e.g.*, baby and juvenile carriers, restraints, bedding, and nursing pillows. According to the Third Circuit, "plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a relevant product market, of the alleged monopolist's dominant share of that market, and of high barriers to entry." *Harrison*

*Aire, Inc. v. Aerostar International, Inc.*, 423 F.3d 374, 381 (3rd Cir. 2005). Here, Babyage makes no claim of market dominance as to any market except pregnancy pillows, and makes no **factual** allegations of any kind about entry barriers as to any product. These allegations are accordingly insufficient under *Twombly*.

Babyage has never alleged any facts explaining **how** the numerous manufacturers of baby and juvenile carriers, restraints, pregnancy pillows, bedding, and nursing pillows are or are not differentiated in any meaningful way that would support an inference of market power. Babyage offers no allegations that raise an inference of "the ability of a single seller to raise price and restrict output." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464 (1992) (quoting *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 503 (1969)). The allegations of market power on the part of Leachco are thus legally insufficient, and fail to state a claim.

## II.     The Sherman Act Section 2 Claim Should Be Dismissed.

Paragraphs 79-83 of the amended complaint allege a conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Much as with a Section 1 claim, a plaintiff alleging a Section 2 claim must offer plausible allegations of a conspiracy, a relevant market at which that conspiracy was directed, anticompetitive effect and market power. See *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 855 F. Supp. 108, 110 (E.D. Pa. 1994) (conspiracy); *Philadelphia Fast Foods, Inc. v. Popeyes Famous Fried Chicken, Inc.*, 647 F. Supp. 216, 229-30 (E.D. Pa. 1986) (relevant market); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) (anticompetitive effect and market power). As explained above, Babyage

has offered no such allegations here. The Section 2 claim should accordingly be dismissed.

Respectfully submitted,

s/ Gary Peterson
Gary Peterson
OK 7068
211 N. Robinson Ave., Suite 450 South
Oklahoma City, OK  73102
telephone:   (405) 606-3367
fax:             (866) 628-0506
email:          gp@garypeterson.com

Sean V. Kemether
PA 70816
Kelly Grimes Pietrangelo & Vakil, P.C.
P.O. Box 1048
Media, PA  19063-0848
telephone:   610-565-2669
fax:             610-565-0780
email:          skemether@kgpv.com

Attorneys for Defendant Leachco

CERTIFICATE OF SERVICE

I certify that I electronically transmitted this document to the Clerk using the ECF System so as to cause transmittal of a Notice of a Electronic Filing to the following ECF registrant:

Andrew J. Katsock, III

Attorney for Babyage.com, Inc. and John M. Kiefer, Jr., on March 31, 2008.

s/ Gary Peterson