IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BABYAGE.COM, INC., : | |
| : | |
| Plaintiff-Counterclaim : | CIVIL ACTION NO. 3:CV-07-1600 |
| Defendant, : | |
| : | |
| v. : | |
| : | (JUDGE CAPUTO) |
| LEACHO, INC., : | |
| : | |
| Defendant-Counterclaim : | |
| Plaintiff/Third Party Plaintiff, : | |
| : | |
| and : | |
| : | |
| JAMIE S. LEACH, : | |
| : | |
| Counterclaim Plaintiff/ Third : | |
| Party Plaintiff, : | |
| : | |
| v. : | |
| : | |
| JOHN M. KIEFER, JR., : | |
| : | |
| Third Party Defendant : | |

**MEMORANDUM**

In the instant case, there is a claim that the Plaintiff BabyAge.com, Inc.'s product infringes on the Defendant Leachco, Inc.'s U.S. Patent No. 6,760,934 for a Symmetrically Contoured Support Pillow (the '934 Patent). There is a dispute regarding the claims construction of the '934 Patent, and this is a question of law for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). There was not a hearing, and there was no extrinsic evidence presented. The matter of the claims construction is ripe and before the Court.

**I.   THE PATENT**

The '934 Patent is entitled "Symmetrically Contoured Support Pillow". The dispute essentially concerns the construction of Claim 1 which provides:

> 1. A symmetrically contoured support pillow formed essentially in an inverted U-shape, comprising essentially a semi-circular crown and a pair of spaced symmetrical legs extending downwardly and outwardly divergently away from the crown, the legs having lower ends which are curved inwardly towards each other and forming toes, each leg having a convex bulge extending inwardly in the space between the two legs, the bulges extending towards each other, the resulting space between the legs as formed by the convex bulges essentially in the shape of an hourglass.

The terms in question are "a semi-circular crown; "a pair of spaced symmetrical legs extending downwardly and outwardly divergently away from the crown"; "the legs having lower ends which are curved inwardly towards each other and forming toes"; "each leg having a convex bulge between the two legs, the bulges extending towards each other . . ."

**II.   LEGAL STANDARD**

The "meaning of a claim term is the meaning that the term would have to aperson of ordinary skill in the art . . . at the time of the invention . . . ." (Phillips v. AWH *Corporation*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)(en banc), *cert. denied*, 126 S.Ct. 1332 (2006)).  The starting point for determining how a person of ordinary skill in the art would understand a claim term "is based on the well-

settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.*

In *Phillips v. AWH Corporation*,[1] 415 F.3d 1303 (Fed. Cir. 2005)(en banc), *cert. denied*, 126 S.Ct. 1332 (2006), the United States Court of Appeals for the Federal Circuit delineated the general principles of claim construction, stressing the importance of intrinsic evidence – i.e., the patent's claims, specification and prosecution history – and severely curtailing the role of extrinsic evidence – i.e., expert and investor testimony, general and technological dictionaries, and learned treatises. *Id*. In so doing, the court renounced the approach to claim construction used in *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), where the dictionary meaning of a claim term was heavily relied upon so as to not import a limitation from the specification into the claim. *Id*. at 1202.

In holding that intrinsic evidence serves as the best guide for construing a patent claim term, the court stated that "the claims themselves provide substantial guidance as to the meaning of a particular claim term." *Id*. at 1314. "It is a bedrock principle of patent law that the claims of a patent define the innovation to which the patentee is entitled the right to exclude." *Id*. at 1312 (citation and

---

[1] In *Phillips*, the main issue before the court was whether the patent claim was to be limited to the embodiments disclosed in the specification – i.e., whether the fact that the only embodiments disclosed in the specification illustrated baffles at angles other than ninety degrees (90°) meant that the claim did not include baffles oriented at ninety degree (90°) angles. The court used "claim differentiation" to resolve this issue, concluding that the claim included baffles at all angles.

3

quotation marks omitted). The context in which the claim term is used,[2] the other claims of the patent,[3] and the differences among the claims[4] can all help a court discern the meaning of a disputed claim term. *Id.*

The court reaffirmed prior holdings that the specification is "the single best guide to the meaning of a disputed term." *Id*. at 1315 (*quoting Vitronics Corp. v. Conceptronic*, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The court explained that there are several reasons why the specification must play an important role in the interpretation of a disputed claim term. *Id*. at 1315-17. First, the claims and the specification are part of a single "fully integrated" instrument. *Id*. at 1315 (citing *Markman v. Westview Instruments*, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)). Therefore, the claims "must be read in view of the specification." *Id.* Second, the specification must, by law, describe the claimed invention in "full, clear, concise, and exact terms." *Id*. at 1316 (quoting 35 U.S.C. § 112 ¶ 1). Third, the Patent and Trademark Office determines the scope of the claims in light of the specification and requires that the meaning of the terms in the claims be ascertainable by reference to the specification. Id. at 1316-17 (citing 37 C.F.R. § 1.75(d)(1)). However, the court did emphasize

---

[2] As an example of how context can be used to construe the meaning of a claim term, the court posited that the reference to "steel baffles" in claim 1 implies that "baffles" are not inherently made of steel. *Id.*

[3] The court asserted that "because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

[4] As an example of claim differentiation, the court explained that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* As noted, *supra*, this doctrine was used by the court to construe the claim as including baffles oriented at all angles, including ninety degree (90°) angles.

4

that the scope of claims should not be limited to the embodiments disclosed in the specification. *Id*. at 1323-24. The court stated that district courts should "avoid importing limitations from the specification into the claims." *Id*. at 1323.

The prosecution history should also be looked to in construing a claim because it "was created by the patentee in attempting to explain and obtain the patent." *Id*. at 1317. While it "often lacks the clarity of the specification," the prosecution history file can be useful in excluding any construction of a claim or term that was disclaimed during prosecution. *Id*. However, a court's reliance on prosecution history must be tempered with the recognition that a "prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Id*. As such, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*.

The court reaffirmed that a district court may, in its discretion, use extrinsic evidence – i.e., expert and inventor testimony, dictionaries and treatises – to construe patent claims. *Id*. at 1319. The court observed that such evidence can be useful to educate the court in the field of art and may also help the court determine what one skilled in the art would understand the claim term to mean. *Id*. However, because it is "general[ly] . . . less reliable than the patent and its prosecution history," the court cautioned that extrinsic evidence should be accorded less weight than intrinsic evidence. *Id*. at 1317-18.[5]

---

[5] The court noted several reasons why extrinsic evidence is less reliable than intrinsic evidence. First, extrinsic evidence is not part of the patent and so was not created for the

The court renounced the approach to claim construction taken by the court in *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002). There, the court looked at the dictionary definition of the disputed claim term first to ascertain its meanings and then looked at the specification and the prosecution history simply to check to see if the inventor limited the claim to only certain of the meanings rather than the full range of dictionary meanings. (*Phillips,* 415 F.3d at 1319-20.) This was done so as not to read a limitation from the specification into the patent claim. *Id.* at 1319.

While acknowledging that the *Texas Digital* court's concern was valid, the *Phillips* court rejected this approach as improperly restricting the role of the specification, which, as mentioned above, the court stated is "the single best guide to the meaning of a disputed term. *Id*. at 1321 (quoting *Vitronics*, 90 F.3d at 1582). The *Phillips* court reasoned that dictionaries focus on abstract meanings of a term rather than the context in which the term is used. *Id*. Significantly, starting with the many meanings included in the dictionary definition and then only eliminating those meanings disclaimed in the claims, specification and prosecution history, makes the claim overbroad. *Id.* This "risks transforming the

---

purpose of disclosing and teaching the invention. Second, extrinsic evidence may not be written by or for one skilled in the art, and, therefore, may not reflect the understanding one skilled in the art would have. Third, expert reports and testimony are biased because they "are generated at the time of and for the purposes of litigation." Fourth, "there is a virtually unbounded universe of potential extrinsic evidence of . . . marginal relevance that could be brought to bear on any claim construction question." Lastly, if relied upon too heavily, extrinsic evidence can change the meaning of claims and undermine the public notice function of the patent. *Id*. at 1318-19.

6

meaning of the claim term." *Id.* Instead, the court suggested that it is better to first look to the specification and prosecution history to see how the inventor used the term in the context of the description and then use the dictionary to confirm this meaning. *Id.* [6]

While the court did not go so far as to limit the use of extrinsic evidence in claim construction or require that intrinsic evidence be looked to first, the court did stress that more weight should be given to intrinsic evidence and that a court could never use extrinsic evidence to contradict the meaning of a claim term that is clear upon considering the intrinsic evidence. *Id*. at 1324.

## III. DISCUSSION

### A. "Semi-Circular Crown"

Leachco argues that semi-circular crown means a section of the pillow having a "semi-circular base against which a user's head can rest." (Doc. 69, p. 4). BabyAge argues that its product does not have a semi-circular crown, and the proof is a simple visual of its product.

The claim (Claim 1) describes a "semi-circular crown." The description of the preferred embodiments speaks of a "semi-circular crown for the user's head

---

[6] The court cautioned that technical dictionaries and treatises suffer from the same deficiencies as general dictionaries. First, the inventor is necessarily describing a novel and non-obvious advancement in the art and so treatises and technical dictionaries might not have ever described it. Second, the inventor may have used the disputed term differently than the way it is used in the treatise or dictionary. Third, learned treatises and technical dictionaries may be "dumbed down" and so they do not demonstrate what one skilled in the art understands the term to mean. Finally, there are many different treatises and dictionaries which will likely have different definitions of the same term. *Id.* at 1322-24.

7

to rest against" when discussing FIG. 1. It also notes that a user can change position by 180° and have the "semi-circular crown . . . positioned between the legs of the user." (Patent, p. 3). There is also an embodiment, FIG. 4, which shows a woman with her head "positioned over the overlapping toes . . . with her legs straddling the semi-circular arch of the pillow." Further, FIG. 5 relates a woman with "her head resting on a semi-circular arch . . ." Based on the designations on the drawings, viz the number 12, the words "crown" and "arch" are interchangeable.

In the history of the patent, it is distinguished from the Brownrigg Pat. No. 6,088,854 in part because the Leachco pillow has "its own head pillow in the form of a semi-circular crown at the upper part of the pillow."

Thus, the "crown" and the "arch" are semi-circular, which means they are in the form of a "half circle." *See, Webster's New World College Dictionary*. Moreover, the crown, as described as the entire top or closed end of the pillow, is not just the base as argued by Leachco. The "pillow" is "in the form of a semi-circular crown" (1934 Patent, p. 1); the "semi-circular crown" is "for the user's head" (*id*. at p. 3); the head rests "on the semi-circular arch" (id. at p. 4). There is, therefore, no distinction between the base of the top portion of the pillow and the portion on which the head is placed. This version proffered by Leachco cannot be accepted.

The semi-circular crown means the top of the pillow is shaped like a semi-circle.

### B. Outwardly Diverging Away From the Crown

The extension of the legs are outward and divergent away from the crown. The description, the drawing and the history clearly indicate that they go downward, i.e. away from the crown, and divergently so as to be away from each other forming the open space in between. The Leachco proffer is sound, and it is accepted by the Court.

The degree of divergence depends on the usage of the product. It is flexible and capable of differing degrees of its general shape to accommodate different resting positions of a pregnant woman. FIGS. 4, 5, 6 and 7 clearly demonstrate this. Moreover, none of the drawings are inconsistent with the language of this claim. Indeed, they lend clarity to the language of the claim.

### C. Overlapping Toes

Leachco argues that the toes or ends of the divergent legs need not always overlap. The claim says "the legs having lower ends which are curved inwardly towards each other and forming toes . . . " BabyAge argues the toes must always overlap. The Court rejects BabyAge's proffered construction.

The claim speaks of the legs, the end of which are the toes that are curved toward each other. There is no mention in the claim of overlapping toes.

The Summary of the Invention states the legs ". . . terminate in a pair of toes that are curved inwardly towards each other such that they essentially abut or touch each other." ('934 Patent, p. 2). The history notes that the "pillow naturally comes together towards itself, with a spring like quality." *(Id.)*

9

The drawings reflect that in its material form, the toes do not overlap. ('934 Patent, Ex. A and FIG. 1). There is the potential for overlap which is duly noted and permits the user to place their head on the toes when overlapped. (FIG. 3 and FIG. 4). There is also the flexibility to use the product with the toes apart or separated. (FIG. 7).

Thus, it is clear from the claim, the history of the patent and the drawings or embodiments that the toes are not required to overlap.

## IV.   CONCLUSION

The construction of the '934 Patent (Claim 1) is that the semi-circular crown is just that. The top side of the pillow is unseparated and inseparable, and it is essentially in the form of a semi-circle from base to top.

The outwardly divergent legs form a general hourglass shape and diverge outwardly to the extent they allow for space for the body of the users. The outwardly divergent legs cannot be viewed in a vacuum and must relate to their ends which are like toes, the result of being "curved inwardly towards each other".

Lastly, the so-called toes need not overlap. Indeed, the product clearly states and demonstrates that they do not.

SO ORDERED, this 18th day of September, 2008.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge