**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

BABYAGE.COM, INC.,

      Plaintiff-Counterclaim Defendant,

          v.

LEACHCO, INC.,

      Defendant-Counterclaim
      Plaintiff/Third Party Plaintiff,

and

JAMIE S. LEACH,

      Counterclaim Plaintiff/Third Party
      Plaintiff,

          v.

JOHN M. KIEFER, JR.,

      Third Party Defendant.

CIVIL ACTION NO. 3:07-cv-1600

(JUDGE CAPUTO)

**MEMORANDUM**

    Presently before the Court is the Motion for Partial Summary Judgment of Plaintiff-Counterclaim Defendant BabyAge.com, Inc. ("BabyAge"). (Doc. 84.) BabyAge moves for summary judgment on Defendant-Counterclaim Plaintiff Leachco's ("Leachco") two counterclaims (Doc. 52), alleging patent and trademark infringement. For the reasons stated below, the Court will grant in part and deny in part BabyAge's motion. The Court will grant the motion as to non-infringement of Leachco's patent and deny the motion as to Leachco's claim for trademark infringement in violation of the Lanham Act. This Court has jurisdiction

pursuant to 28 U.S.C. §§ 1331, 1338, and 15 U.S.C. § 1121.

## BACKGROUND

On August 8, 2007, BabyAge brought suit against Leachco. In its answer, Leachco asserted two counterclaims against BabyAge, alleging patent infringement and trademark infringement. (Am. Countercls. ¶¶ 1-26, Doc. 52).

BabyAge is a retailer of baby and maternity-related products, which it sells on its website, BabyAge.com ("the Website"). (BabyAge Rule 56.1 Statement ¶ 6, Doc. 85.) Among the products it sells are items manufactured for BabyAge and sold under that trademark. (Kiefer Decl. ¶ 2, Doc. 85.) BabyAge also offers products from numerous other manufacturers under different trademarks, including items manufactured by Leachco. (*Id*. ¶ 3.) Consumers can shop for products on the Website by product category or by brand. (*Id*.)

Leachco is a manufacturer of baby and maternity-related merchandise, which it distributes to retailers worldwide under its "Leachco" trademark. (Leach Decl. ¶ 2, Doc. 91, Ex. 1.) One of its products is a contoured body pillow for pregnant women called the Back'n'Belly pillow. This product is covered by the claims of U.S. Patent No. 6,760,934 ("the '934 Patent") for a "Symmetrically Contoured Support Pillow" ('934 Patent, Column 1, Doc. 91, Ex. 2) of which Leachco is the exclusive licensee (Leach Decl. ¶¶ 3, 4). BabyAge ordered the Back'n'Belly pillow from Leachco and offered it for resale on its Website between the years 2003 and 2007. (*Id*. ¶ 5.) In January 2007, Leachco Vice President Jamie Leach learned that BabyAge also offers its own make of pregnancy pillow on the Website, known as the Cozy Comfort pillow, which competes with the Back'n'Belly pillow. *(Id*. ¶ 6.) Leachco

asserts that the Cozy Comfort pillow infringes the '934 Patent.[1]

In its second counterclaim, Leachco alleges that BabyAge used the Leachco trademark on its Website in a manner that constitutes trademark infringement in violation of Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a). The Website includes "featured brand" webpages separately dedicated to the products each listed manufacturers. (Leach Decl. ¶ 14.) Leachco is one of the "featured brand" manufacturers on the Website and its webpage is found at http://www.babyage.com/brands/leachco.htm. (*Id*.) As the

---

[1] The '934 Patent is comprised of one (1) independent and two (2) dependant claims. ('934 Patent, Columns 4-6.) It claims the following:

1. A symmetrically contoured support pillow formed essentially in an inverted U-shape, comprising essentially a semi-circular crown and a pair of spaced symmetrical legs extending downwardly and outwardly divergently away from the crown, the legs having lower ends which are curved inwardly towards each other and forming toes, each leg having a convex bulge extending inwardly in the space between the two legs, the bulges extending towards each other, the resulting space between the legs as formed by the convex bulge being essentially in the shape of an hourglass.

2. A symmetrically contoured support pillow as set forth in claim 1 wherein the crown is designed to support the head of a woman who is lying between the legs of the pillow on her side such that one of the bulges is received in a curvature of the back of a woman whereas the other bulge is received in the tummy area of the woman.

3. A symmetrically contoured pillow as set forth in claim 1 wherein the toes are moved towards each other to create an overlapping condition, wherein the head of the woman is adapted to the rest on the overlapping toes while one bulge is received in the curvature of the back of the woman and the other bulge is received in the tummy area of the woman.

(*Id*.)

Leachco "featured brand" webpage existed at some point in 2007,[2] it displayed the "Leachco" trademark and included a section of the page entitled "Pregnancy Pillows." (Doc. 91, Ex. 11.) Under the "Pregnancy Pillow" heading was the following text:

> Designed to ease the sleep discomfort associated with pregnancy. A maternity pillow helps to offer a relaxing night's rest. One of the great features on all pregnancy pillows is that they are comfortable. A mother needs her comfort and a pregnancy pillow will provide that. Most of the maternity pillows keep comfort as a top priority, but also strive to keep support at the forefront as well. A great pregnancy pillow will be able to creat [sic] support by aligning the hips, elevating the ankles and supporting the belly. One maternity pillow which can do this is the <u>Today's Mom Cozy Comfort</u>. It helps keep all of the major pain areas aligned, separating it from the other, older versions of maternity pillows. Prengnacy [sic] pillows come in a variety of shapes and sizes. There are different types of padding and colors available for pregnancy pillows. It is important to have breathable material in a maternity pillow. Maternity pillows should also offer up washable fabrics. A great maternity pillow is the <u>Serenity Star</u> from Moonlight Slumber. It is a full length pregnancy pillow which helps to regulate the body temperature with its great fabric. We offer an enormous variety of pregnancy pillows. Every mother will enjoy such a wide selection.

(*Id.*) The underlined text, "Today's Mom Cozy Comfort" and "Serenity Star," denoted clickable hyperlinks that, when selected, took the viewer to webpages containing non-Leachco products, including BabyAge's Cozy Comfort pillow, a lower-priced competitor of Leachco's Back'n'Belly pillow. (Leach Decl. ¶ 18; Doc. 91, Exs. 11, 12, 13.) Leachco argues that this webpage content constitutes an unlawful "bait and switch" whereby prospective customers are "baited" by Leachco's brand into visiting the Leachco "featured brand" webpage on the BabyAge Website, baited into pursuing a Leachco pregnancy pillow, and

---

[2]     Leachco provides screen shots of the webpage and a declaration from company Vice President Jamie Leach stating that the shots were taken in 2007, but Leach does not specify when in 2007 they were taken. (Leach Decl. ¶ 15, 16, 17; Doc. 91, Exs. 11, 12, 13.)

then "switched" to non-Leachco pregnancy pillows by the above-mentioned hyperlinks provided on the webpage. (Br. in Opp'n to Mot. for Partial Summ. J. 7, Doc. 91.)

After BabyAge filed its original complaint in this action on August 30, 2007 (Doc. 1), Leachco filed its Answer, asserting the above two counterclaims, on November 2, 2007 (Doc. 5). With leave of the Court, BabyAge filed an Amended Complaint on March 17, 2008. (Doc. 42.) In response, Leachco filed an Answer with Amended Counterclaims (Doc. 52.) against BabyAge on April 14, 2008, again asserting patent and trademark infringement counterclaims.

On September 18, 2008, this Court issued a Memorandum and Order on the claims construction of the '934 Patent, construing several claim terms disputed by the parties. (Doc. 80.) BabyAge then filed the present Motion for Partial Summary Judgment on October 7, 2008, moving for summary judgment on Leachco's two counterclaims. (Doc. 84.) It argues that the patent infringement claim was effectively resolved in its favor by the Court's construction of the '934 Patent claims and that it is also entitled to summary judgment on Leachco's trademark infringement claim. (Mem. in Supp. of Mot. for Partial Summ. J. 2, Doc. 86.) Leachco filed a brief in opposition on October 22, 2008. (Doc. 91.) BabyAge filed a reply on November 3, 2008. (Doc. 95.) This motion is fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its existence or

nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *Id.*  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in

the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**DISCUSSION**

**I.      Patent Infringement Claim**

BabyAge argues it is entitled to summary judgment on Leachco's claim of patent infringement because, as a result of the Court's construction of the '934 Patent, there remains no genuine issue of material fact and it is entitled to a determination of non-infringement.  **"**A determination of infringement requires a two-step analysis.  First, the court construes the asserted claims in order to determine their proper meaning and scope." *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,* 308 F.3d 1167, 1176-77 (Fed. Cir. 2002) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996)).  "After the court construes the claims, these claims are compared to the accused device."  *Id.* (citing *Bell Atl. Network Servs. v. Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001)). Claim construction is a question of law for the court, whereas the determination of whether the accused product infringes is a question of fact.  *Id.*  Whether the product infringes the construed claims literally, or under the doctrine of equivalents, is a question of fact.  *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998).  However, the construction of the claims may resolve some or all of the infringement issues.  *Netword, LLC*

*v. Centraal Corp.*, 242 F.3d 1347, 1351 (Fed. Cir. 2001) (citing *Vivide Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

In order to establish infringement, "every limitation set forth in the patent claim must be found in an accused product or process exactly or by a substantial equivalent." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) (citing *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed. Cir. 1989)).

This Court completed the first step of the analysis in its Memorandum and Order of September 18, 2008. *BabyAge.com, Inc. v. Leachco, Inc.*, No. 07-cv-1600, slip. op. (M.D. Pa. Sept. 18, 2008) (Caputo, J.)  In that opinion, the Court construed three disputed claim terms of the '934 Patent, including (1) "semi-circular crown;" (2) "a pair of spaced symmetrical legs extending downwardly and outwardly divergently away from the crown;" and (3) "each leg having a convex bulge between the two legs, the bulges extending towards each other ...." *Id*. at 2.  Only the first term, "semi-circular crown," is at issue in this motion. The Court rejected Leachco's argument that "semi-circular crown" means a section of the pillow having a "semi-circular base against which a user's head can rest," construing it instead to include the entire top or closed end of the pillow. *Id*. at 7,8.  The Court held that "[t]he semi-circular crown means the top of the pillow is shaped like a semi-circle." *Id*. at 8.

Moving to the second step of the infringement determination, the Court will consider whether summary judgment is appropriate on either a theory of literal infringement or under the doctrine of equivalents.

8

A.    Literal Infringement

For a finding of literal infringement, each limitation of the claim must be present in the accused device.  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).  BabyAge argues that, given the Court's construction of the term "semi-circular crown," there is no dispute the Cozy Comfort pillow does not literally infringe the '934 Patent. The top or closed end of the Cozy Comfort pillow is not shaped like a semi-circle.  (Doc. 91, Ex. 4.)  Rather, it has a semi-circular base and squared corners at the top of the crown.  (*Id.*) Because a limitation of claim 1 of the patent requires that the crown be shaped like a semi-circle, there can be no literal infringement.  Leachco concedes that under the Court's construction of "semi-circular crown," this limitation is not literally satisfied by the accused product.

Because there is no dispute that each limitation of the asserted claim is not present in the Cozy Comfort pillow, there can be no finding of literal infringement as a matter of law.

B.    Doctrine of Equivalents

Leachco argues that, while there is no literal infringement, a finding of infringement is appropriate under the doctrine of equivalents because the crown of the accused product is the equivalent of the semi-circular crown limitation and the accused product includes every other element of claims 1,2, and 3 of the '934 Patent.

"A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device."  *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir.

1997).  A finding of equivalency is appropriate where:

> ... only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device.... Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to this determination.

*Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1335 (Fed. Cir. 2000) (internal quotations omitted).

Courts have long recognized the competing equities at play in the doctrine's application.  As the U.S. Supreme Court explains:

> [A] patent protects its holder against efforts of copyists to evade liability for infringement by making only insubstantial changes to a patented invention. At the same time, we appreciate[ ] that by extending protection beyond the literal terms in a patent the doctrine of equivalents can create substantial uncertainty about where the patent monopoly ends.  If the range of equivalents is unclear, competitors may be unable to determine what is a permitted alternative to a patented invention and what is an infringing equivalent.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 727 (2002) (internal citations omitted).

In an effort to strike a balance between these competing interests, several rules have developed that limit the application of the doctrine of equivalents.  One such rule relevant to this case is the "all limitations" rule.  The rule has two (2) primary implications.  "First, the all limitations rule requires that equivalence be assessed on a limitation-by-limitation basis, as opposed to from the perspective of the invention as a whole."  *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005).  "Second, an element of an

accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation." *Id.* (citing *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997)). As a corollary to the all limitations rule, "the concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims." *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 400 (Fed. Cir. 1994).

> The U.S. Court of Appeals for the Federal Circuit has explained:

> There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless.

*Freedman Seating,* 420 F.3d at 1359.

In *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998), the Federal Circuit Court of Appeals held that a hemispherically-shaped artificial hip socket cup was not equivalent to a conically-shaped cup because to so hold would vitiate a claim limitation. The limitations at issue required that the cup have a "generally conical outer surface." *Id*. at 1156. While the Federal Circuit Court of Appeals later emphasized that *Tronzo* "does not stand for the proposition that a claim limitation describing a specific shape of a claimed structure cannot be infringed under the doctrine of equivalents by a differently shaped structure," *Optical Disc Corp*., 208 F.3d at 1337, the *Tronzo* court was particularly concerned by expert testimony concluding that "*any* shape would be equivalent to the conical limitation of [the claims]," *Tronzo*, 156 F.3d at 1160. The court reasoned that such a result would

11

violate the all limitations rule by reading the limitation out of the claims. *Id*.

In arguing that the crown of the Cozy Comfort pillow is equivalent to the "semi-circular crown" element of the '934 Patent, Leachco asserts that the top corners of the pillow's crown are functionally irrelevant. It argues that the accused product performs substantially the same function, in substantially the same way, to get substantially the same result because, like claim 1 of the '934 Patent, it includes a semi-circular base against which a pregnant woman's head rests. The Cozy Comfort pillow's square top corners, which do not touch or support the head, have no impact on the use of the pillow. Leachco asserts, however, that this does not mean *any* shape of crown would be equivalent to the "semi-circular crown" limitation. It argues that the crown must have at least a semi-circular base to be equivalent.

Leachco's argument does not meaningfully distinguish this case from *Tronzo*. Its assertion that the top of the crown is functionally irrelevant implies that not only square corners, but *any*-shaped corner or top of the crown would be equivalent to the "semi-circular crown" limitation, as long the product had a semi-circular base. Because this Court interprets the "crown" of the pillow to include both the top and the base (as they are both within "the entire top or closed end of the pillow"), Leachco's argument necessarily implies that one side of the crown could be any shape and still be the equivalent of a limitation interpreted to mean that "the top of the pillow is shaped like a semi-circle." *BabyAge.com.*, slip op. at 8. As in *Tronzo*, such a result would read the "semi-circular crown" limitation out of the claim.

Several other factors weigh towards concluding that equivalence in this case would vitiate the "semi-circular crown" element. In determining whether a limitation is vitiated, the

12

Federal Circuit Court of Appeals has stressed considerations such as, "the simplicity of the structure, the specificity and narrowness of the claim, and the foreseeability of variations at the time of filing the claim...." *Freedman Seating*, 420 F.3d at 1360 (citing *Sage Prods.,* 126 F.3d at 1425. Here, the structure of the single, body-sized pillow reflected in the '934 Patent is extremely simple. The claim at issue (claim 1) is very narrow and specific, describing the curves, shape, and symmetry of the pillow. It is this narrow and specific description that differentiates the particular shape of this pregnancy pillow from other maternity pillows described in the prior art section of the '934 Patent, almost all of which are single, body-sized pillows distinguished from each other by variances in shape and symmetry. ('934 Patent, Columns 1-2.) Considering the apparent importance of small shape changes in designing a new pregnancy pillow at the time the '934 Patent was filed, it was foreseeable that variances would arise in the future. These considerations weigh towards the conclusion that, looking at the totality of the circumstances, it would vitiate the "semi-circular crown" limitation to find that a crown with squared corners is its equivalent. The patent inventor used specific language, referring to a specific shape, in the context of a simple product, differentiated from other similar products *by its shape*.

Because the Court concludes that the all limitations rule precludes application of the doctrine of equivalents in this case, it is appropriate to enter summary judgment as to non-infringement of the '934 Patent. *See Warner-Jenkinson Co.*, 520 U.S. 39 n. 8 ("if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further material issue for the jury to resolve").

## II.    Trademark Infringement Claim

BabyAge next argues that it is entitled to summary judgment on Leachco's second counterclaim alleging trademark infringement.  Leachco claims that, in placing hyperlinks to competing products on the Leachco "featured brand" webpage on the BabyAge Website—a page containing Leacho's trademark—BabyAge violated Section 43(a) of the Lanham Act, codified at 15 U.S.C  § 1125(a).[3]

To establish a violation of Section 43(a) of the Lanham Act, Leachco must prove: (1) ownership of the trademark, (2) the mark is valid and legally protectable; and (3) BabyAge's use of the mark to identify goods or services is likely to create confusion.  *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001).

A mark that is federally registered and incontestable is deemed valid and legally

---

[3] Section 43(a) provides in relevant part:

(a) Civil action.
> (1) Any person who, on or in connection with any goods or services, or
> any container for goods, uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any false
> designation of origin, false or misleading description of fact, or false
> or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive
> as to the affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval of his
> or her goods, services, or commercial activities by another person
> ...
>
> shall be liable in a civil action by any other person who believe that he or
> she is or is likely to be damages by such act.

15 U.S.C. § 1125(a).

14

protectable. *Id.* at 281 n. 6 (quoting *Commerce Nat'l Ins. Servs., Inc v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000)). "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture v. Vigoro Indus.*, 30 F.3d 466, 472 n. 7 (3d Cir. 1994). Leachco submits the declaration of the company's vice-president attesting that the "Leachco" trademark is federally registered and has been used for twenty (20) years. (Leach Decl. ¶ 2.) Neither party argues that the company's ownership or right to register the Leachco trademark is contested. Thus, the evidence at this stage suggests that Leachco can prove the first two requirements. The parties' arguments center around the third requirement, likelihood of confusion.

Leachco argues that the use of its trademark on the Leachco "featured brand" webpage of the BabyAge Website containing hyperlinks to competing products presents a case of "initial interest confusion." This is a "type" of confusion, "'that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.'" *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007) (quoting 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:6 (4th ed. 2007) (hereinafter "*McCarthy on Trademarks*"). Though the consumer may become aware of the product's true source before purchase, the initial confusion may nonetheless damage the trademark plaintiff. As one treatise explains, the damage can manifest in several ways:

> First, the prospective customer may be diverted to a store or web site that he or she believes - incorrectly - is associated with the trademark owner.

15

Second, the trademark owner's prospective customer may decide to buy the product that is not associated with the trademark owner, whether or not it believes at the time of purchase that the product is associated with the trademark owner. Third, the customer may rely on the trademark owner's reputation in purchasing the infringing product, a reputation that has been time-consuming and expensive for the trademark owner to create.

Anne Gilson LaLonde, *Gilson on Trademarks* § 5.14 (2008) (citing *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1239 (10th Cir. 2006).[4]

In the Third Circuit, initial interest confusion is an "independently sufficient theory that may be used to prove likelihood of confusion." *McNeil Nutritionals,* 511 F.3d at 358. In all cases involving likelihood of confusion under the Lanham Act, the U.S. Court of Appeals for the Third Circuit applies a ten-factor analysis to determine whether such likelihood exists, set forth in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983), and commonly

---

[4]     BabyAge argues that Leachco cannot assert an initial interest confusion theory based on the present facts because the doctrine may be applied "only if and when a risk of confusion between two trademarks is exploited by the infringer to the disadvantage of the mark holder." (Repy Mem. in Supp. of Mot. for Partial Summ. J. 5, Doc. 95.) Because the facts reveal no trademark of BabyAge that is confusingly similar to that of Leachco, BabyAge asserts there can be no risk of confusion. This argument misses the mark. The crux of the theory is the use of another's trademark to lure a consumer to one's own product or service, even if the confusion clears before purchase. This does not necessarily require a second, similar mark. Indeed, one of the most common applications of the doctrine in the internet context involves a defendant's use of a plaintiff's mark in the metatags of the former's website. *E.g.*, *Australian Gold*, 436 F.3d at 1239. A metatag is unseen data embedded in a website read by a search engine and used to classify a website. *Id*. at 1233 n. 3. It increases the probability that a website will be viewed by a person entering a particular search term into a search engine. *Id*. Metatag cases focus on the defendant's use of the plaintiff's mark, not a comparison between marks. *E.g. id.* at 1238-40. Similarly here, Leachco focuses on BabyAge's use of its mark, arguing the Leachco name is used to channel customers towards non-Leachco products.

known as the Lapp factors:

>(1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
>(2) the strength of the owner's mark;
>
>(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
>(4) the length of time the defendant has used the mark without evidence of actual confusion;
>
>(5) the intent of the defendant in adopting the mark;
>
>(6) the evidence of actual confusion;
>
>(7) whether the goods are marketed through the same channels of trade and advertised through the same media;
>
>(8) the extent to which the targets of the parties' sales efforts are the same;
>
>(9) the relationship of the goods in the minds of consumers because of the similarity of functions; and
>
>(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

No one factor is determinative; they must be balanced against each other in a qualitative inquiry. *Checkpoint*, 269 F.3d at 280. Not all factors are relevant in all cases. *Id*. In cases of initial interest confusion, the Third Circuit Court of Appeals has stressed that the relatedness of the products at issue and the level of care exercised by consumers are of particular concern because a similar defendant product purchased without a high level of care is more likely to benefit from initial confusion. *Id*. at 296-97. The Court will address these concerns in its discussion of the Lapp factors. Looking at all relevant factors, the Court must determine whether, in the totality of the circumstances,

marketplace confusion is likely. *Id*. at 297. As the analysis is highly fact-intensive, "summary judgment for either party is unlikely, absent a particularly one-sided factual record on the issue." *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 285 (D.N.J. 2006).

A.    Similarity of Mark: Lapp Factor (1)

This factor, often the most critical where the alleged confusion arises between two similar trademarks, *Checkpoint*, 269 F.3d at 281, is not highly relevant in the present case, where the alleged confusion arises from BabyAge's use of Leachco's mark. Here, there is no dispute that there is exact identity between the mark used on BabyAge's "featured brand" webpage featuring Leachco products and Leachco's trademark. However, it is the placement of Leachco's mark on a page containing hyperlinks to non-Leachco products that arguably causes confusion regarding the source of the linked products. Thus, the undisputed use of the Leachco mark is not probative of marketplace confusion here, but rather how it was used.

B.    Strength of Mark: Lapp Factor (2)

Stronger trademarks receive greater protection under the Lanham Act. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 222 (3d Cir. 2000). "The strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition." *Checkpoint*, 269 F.3d at 282. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of "marketplace recognition." *A&H Sportswear*, 237 F.3d at 221.

18

1.    *Distinctiveness or Conceptual Strength*

Trademark protection under the Lanham Act is divided into four categories:

> [1] Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they bear no logical or suggestive relation to the actual characteristics of the goods. [2] Suggestive marks require consumer imagination, thought, or perception to determine what the product is.  [3] Descriptive terms forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods.  Generic marks are those that function as the common descriptive name of a product class.

*A&H Sportswear,* 237 F.3d at 221-22 (internal quotations and citations omitted).

To qualify for protection under the Act, a mark must be either arbitrary, suggestive, or must be descriptive with a demonstrated secondary meaning.[5]  *Id.* at 222.  Generic marks do not receive trademark protection.  *Id.*  These categories are also a useful proxy in most circumstances for the first prong of determining mark strength—which in turn determines the level of protection given—because "the classification system's primary purpose is ... to determine whether consumers are likely to perceive the mark as a signifier of origin, rather than as a mere identification of the type of product."  *Id*.  As the *A&H Sportswear* court noted, "These two inquiries—whether a mark is, in fact, a trademark, versus how much protection the mark should receive–are often identical...." *Id*.

Here, it is clear that the Leachco mark falls into the arbitrary category and acts as distinctive signifier of origin versus an identification of a type of product.  The company

---

[5]    "A mark is descriptive with a secondary meaning when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products of services."  *Checkpoint*, 269 F.3d at 283 n. 10.

name and trademark, Leachco, appears to be a wordplay on a family name. It does not describe nor suggest any product, let alone baby and maternity products in particular. When the Leachco mark is used in association with a product sold by the company, it neither suggests nor describes "any ingredient, quality, or characteristic" of the good. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 390 F.2d 277, 292 n. 18 (3d Cir. 1991) (quoting 1 *McCarthy on Trademarks* § 11:4) (defining an arbitrary mark). Because the Leachco trademark is inherently distinctive, the first prong suggests a strong mark and greater protection.

    2.      *Commercial Strength or Marketplace Recognition*

Leachco provides some evidence relevant to the second prong through the declaration if its Vice President, Jamie Leach. Leach states:

> Leachco's products are distributed through worldwide network of retailers, who sell from conventional retail stores, catalogs, and the Internet. Leachco has been in business since 1981.... Over the past 20 years, the Leachco brand and trademark have been applied to a wide range of baby and maternity products, and have been extensively promoted and advertised, both in print, in conventional retails stores, and on the Internet.

(Leach Decl. ¶ 2.)

Though this does not necessarily speak to the level of public recognition or commercial strength the company's products enjoy, Leachco indicates a sustained and widespread dissemination of its name and brand. When this evidence is considered in conjunction with the inherent distinctness of its mark, the balance weighs in favor of considering the mark relatively strong, warranting concomitantly strong protection.

**C.** **Price of the Goods and Other Factors Indicative of the Care and Attention**

**Expected of Consumers when Making a Purchase: Lapp Factor (3)**

Courts generally do not find Lanham Act violations in circumstances where a consumer is more likely to exercise heightened care before making a purchase, such as where the relevant product or service is expensive or the consumer class consists of sophisticated or professional purchasers. *Checkpoint*, 269 F.3d at 284. In such cases, the likelihood of confusion is lessened. On the other hand, inexpensive products and unsophisticated buyers present a greater likelihood of confusion because these circumstances generally encourage less care in purchasing decisions. *Id*. Where the consumer class is mixed, courts apply the standard of care exercised by the least sophisticated consumer. *Id*. at 285.

As noted above, this factor is particularly relevant to the initial interest confusion analysis because a buyer exercising less care is more likely to be mistaken, and though the confusion clears, a defendant may still derive a benefit from the initial mistake. However, there is little evidence on the present record useful to evaluating how the factor weighs in this case. BabyAge provides images from its Website indicating that its Cozy Comfort pillow costs just under fifty dollars ($50). (Doc. 85, Ex. D.) Other body-sized pregnancy pillows displayed for sale alongside the Cozy Comfort are similarly priced in a range between about forty-five ($45) to sixty ($60) dollars.[6] But while some idea of price is given, there is no evidence of the kind of care customers generally exercise when

---

[6]     The webpage images offered by BabyAge represent the Website as it existed on September 30, 2008, whereas Leachco's arguments focus on the site as it existed in 2007. However, the Court will assume that the general price range has not changed dramatically in intervening months.

21

purchasing such a pillow over the internet.  The products reflected in the prior art section of the '934 Patent remind that pregnancy pillows are often distinguished by relatively small differences.  However, this fact cuts both ways; it might encourage consumers to purchase at random, or it might encourage great awareness of small details, or perhaps a mixture of both.  At this point, there simply is not enough evidence to know.  While the class of product here is fairly inexpensive, the Court cannot conclude that this fact alone tells enough about the level of care exercised by the relevant consumer group to appropriately weigh this Lapp factor.  As this factor is particularly important to establishing likelihood of confusion on an initial interest confusion theory, the facts require further development.

    D.    <u>The Length of Time Defendant has Used the Mark without Evidence of</u>
                    <u>Actual Confusion & Evidence of Actual Confusion: Lapp Factors (4) & (6)</u>

Evidence of actual confusion is not required to prove a likelihood of confusion, but it is highly probative when offered.  *Checkpoint,* 269 F.3d at 291.  On the other hand, the passage of an appreciable amount of time without evidence of actual confusion can give rise to the inference that such confusion will not likely occur in the future.  *Id.* (quoting *Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205 (3d Cir. 1995).

The existence or nonexistence of this type of evidence was the subject of an ongoing discovery dispute between the parties at the time of briefing the present motion. Babyage asserts through declaration of its chief executive officer (CEO) that, after investigation, it knows of no instance where a consumer believed a BabyAge product was made by Leachco or vice versa.  (Kiefer Decl. ¶¶ 12-13.)  Leachco asserts through declaration of its attorney that it requested, and BabyAge has failed to produce, invoices,

sale records, and emails related to the Cozy Comfort pillow as well as records from the Website for webpages relating to Leachco or the Cozy Comfort pillow.  (Peterson Decl. ¶ 5, Doc. 91, Ex. 14.)  BabyAge's assertions relate primarily to confusion at the point of sale.  Leachco seeks information regarding both the point of sale and internet traffic that may speak to confusion prior to sale.  Because such evidence may be probative of initial interest confusion and is the subject of a discovery dispute, the Court cannot appropriately consider this factor at this time.

     E.    <u>Intent of Defendant in Adopting the Mark: Lapp Factor (5)</u>

     Evidence of a party's intentional use of another's mark is not required to prove a Lanham Act violation, but evidence of intentional or willful conduct weighs strongly in favor of finding a likelihood of confusion.  *Checkpoint*, 269 F.3d at 286.  Here, Leachco gives no direct evidence of intentional or willful conduct and BabyAge, through declaration of its CEO, asserts that the company never intentionally sought to make improper use of the Leachco mark.  (Kiefer Decl. ¶¶ 10-11.)  Because intent is not required, but not asserted here, this factor has no impact on the analysis.

     F.    <u>Whether the Goods are Marketed through the Same Channels of Trade & Extent to which the Targets of the Parties' Sales Efforts are the Same: Lapp Factors (7) & (8)</u>

     The greater the similarity in the channels used by the parties to advertise and market their products, the greater the likelihood of confusion.  *Checkpoint*, 269 F.3d at 288-89.  Similarly, evidence that parties target their sales efforts to the same consumer group leads to a stronger likelihood of confusion.  *Id.* at 289.

     As to channels of trade, BabyAge indicates that it sells its own and others'

products through its Website, mentioning no other advertising/marketing channels. (Kiefer Decl. ¶ 2.) Leachco indicates it sells products through retailers selling in stores, catalogs, and the internet. (Leach Decl. ¶ 2.) It promotes and/or advertises its products in print media, in retail stores, and over the internet. (*Id*.) During the period of the allegedly infringing use of Leachco's mark, competing pregnancy pillows made by both companies were sold through the BabyAge Website. (*Id*. ¶¶ 5-6, 15-16.) Thus, there is significant overlap in the channels of trade used by the parties; indeed, Leachco seems to simply have a larger breadth of advertising and distribution in the same market and channels used by BabyAge.

As to the targets of the parties' sales efforts, the target consumer group is the same for both companies. Both sell baby and maternity-related goods and both rely on an internet consumer base, though Leachco does not rely exclusively on this group while BabyAge does.

Given these facts, Lapp factors seven (7) and eight (8) both weigh towards a greater likelihood of confusion.

G.     Relationship of Goods in the Minds of Consumers Because of Similarity of Function: Lapp Factor (9)

Under this factor, "[t]he question is whether the consumer might ... reasonably conclude that one company would offer both of these related products." *Fisons Horticulture*, 30 F.3d at 481. "The test is whether the goods are similar enough that a customer would assume they were offered by the same source." *Checkpoint*, 269 F.3d at 286. As mentioned above, product relatedness is particularly important to the initial interest analysis because "[w]hen products are similar, a firm is more likely to benefit from

the goodwill of a firm with an established mark." *Id.* at 298. Taking advantage of another mark's goodwill can allow a competitor to get its foot in the door via initial confusion. Therefore, in this context, closely related products strongly indicate a greater likelihood of confusion.

Here, as the above patent infringement discussion highlights, the parties' competing pregnancy pillows are extremely similar, differentiated only by small details of shape (which Leachco argues are inconsequential to function) and serve the same purpose, namely providing full-body comfort and support to a pregnant woman lying down. Moreover, similarly sized pregnancy pillows offered by different companies are in the same general price range. Thus, unless differentiated specifically by brand name, it is unlikely a consumer could identify the particular source of the competing pillows. This factor weighs heavily towards a greater likelihood of confusion and could easily assume they were offered by the same source.

    H.    <u>Evidence of Converging Markets: Lapp Factor (10)</u>

This factor considers whether there is evidence a trademark plaintiff is moving or has moved into the same market as the defendant and is primarily relevant in non-competing product cases. *Id.* at 290. This is a case of directly competing goods in which the trademark plaintiff and defendant already occupy the same market. Therefore, this factor is not relevant to the analysis.

    I.    <u>Summary & Conclusion</u>

Evaluating the Lapp factors on the record as currently developed, the Court concludes that BabyAge's motion for summary judgment on Leachco's trademark infringement claim must be denied. The second factor indicates the Leachco has a

relatively strong trademark that must be afforded a heightened level of protection.  The third, fourth, and sixth factors require further factual development to be appropriately weighed in the analysis, particularly the third factor dealing with the level of care exercised by the relevant consumers.  Finally, the seventh, eighth, and ninth factors weigh towards a greater likelihood of confusion and thus against granting summary judgment in favor the trademark defendant.  In sum, BabyAge has not met its burden of proving there is no dispute of material fact as to the likelihood of confusion element of Leachco's Lanham Act claim.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Motion for Partial Summary Judgement of Plaintiff-Counterclaim Defendant BabyAge.  (Doc. 84.) Because Leachco cannot prove literal infringement and because the Court concludes that the all limitations rule precludes application of the doctrine of equivalents in this case, the Court will grant BabyAge's motion for summary judgment on non-infringement of the '934 Patent.  Next, because the Court concludes there remains a dispute of material fact as to whether Leachco can demonstrate a likelihood of consumer confusion, the Court will deny BabyAge's motion for summary judgment on Leachco's claim for violation of Section 43(a) of the Lanham Act.

An appropriate Order follows.

January 12, 2009                                    /s/ A. Richard Caputo           
Date                                                         A. Richard Caputo
                                                                 United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BABYAGE.COM, INC., | CIVIL ACTION NO. 3:07-cv-1600 |
| Plaintiff-Counterclaim Defendant, | |
| v. | (JUDGE CAPUTO) |
| LEACHCO, INC., | |
| Defendant-Counterclaim Plaintiff/Third Party Plaintiff, | |
| and | |
| JAMIE S. LEACH, | |
| Counterclaim Plaintiff/Third Party Plaintiff, | |
| v. | |
| JOHN M. KIEFER, JR., | |
| Third Party Defendant. | |

## ORDER

**NOW**, this __12th__ day of January, 2009, **IT IS HEREBY ORDERED** that:

(1)    Plaintiff-Counterclaim Defendant BabyAge's motion for summary judgment as to non-infringement of the '934 Patent (Doc. 84) is **GRANTED**.

(2)    Plaintiff-Counterclaim Defendant BabyAge's motion for summary judgment on Defendant-Counterclaim Plaintiff Leachco's claim for violation of the Lanham Act (Doc. 84) is **DENIED.**

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge